**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**
**CASE NO.: 3:24-cv-00100-TKW-ZCB**

JOHN GLASSMAN, as Curator of The Estate of James Bryan Chestnut, deceased,

Plaintiff,

v.

OKALOOSA COUNTY, FLORIDA, JAMES FILPI, CLINTON COLBERT, STANLEY CHOPP, DERRICK HOPKINS, RICHARD PINKHAM, FELIX ZULLO, STEVEN BARCELO, ZACHARY MILLER, CHS TX, INC. D/B/A YESCARE, NICHOLAS DELGADO, M.D., and DANIELLE COOK, RN,

Defendants.
_______________________________/

**PLAINTIFF'S DISCLOSURE OF REBUTTAL EXPERT**
**TESTIMONY OF DONALD L. LEACH, II**

Plaintiff, John Glassman as Curator of the Estate of James Bryan Chestnut, pursuant to Federal Rule of Civil Procedure 26(a)(2)(D)(ii), serves this report of expert Donald L. Leach, II, as follows:

EXHIBIT D

***JOHN GLASSMAN, as Curator of The Estate of James Bryan Chestnut, deceased,***
***Plaintiff,***
***v***
***OKALOOSA COUNTY, FLORIDA, JAMES FILPI, CLINTON COLBERT, STANLEY CHOPP, DERRICK HOPKINS, RICHARD PINKHAM, FELIX ZULLO, STEVEN BARCELO, and ZACHARY MILLER,***
***Defendants,***
***in the***
***UNITED STATES DISTRICT COURT for the NORTHERN DISTRICT OF FLORIDA,***
***PENSACOLA DIVISION,***
***CASE NUMBER 3:24-cv-00100-TKW-ZCB***

# REBUTTAL EXPERT REPORT

## I. INTRODUCTION

This document serves as a rebuttal expert report concerning the care and custody of Mr. James Bryan Chestnut during his confinement at the Okaloosa County Department of Corrections in Crestview, Florida, on January 1, 2022. The report is based upon the information detailed in the "Materials Reviewed" section. I reserve the right to modify my opinions and conclusions should additional information be made available that impacts the findings presented herein.

## II. QUALIFICATIONS

Since 1984, I have served extensively within the criminal justice system, commencing my career as a Deputy Jailer at the Fayette County Detention Center in Lexington, Kentucky. In 1985, I was entrusted with the role of Training Coordinator, where I initiated and developed a structured Pre-service and In-service training program tailored for Deputy Jailers. My duties also encompassed the development, revision, and upkeep of the Detention Center's policies and procedures, a responsibility I held until 1992.

Subsequently, I transitioned to the role of Planning and Research Analyst at the Detention Center. In this capacity, I oversaw the development and implementation of an objective jail classification system, which entailed establishing a management information system infrastructure and programming to support the classification goals. In 1996, I advanced to the position of Administrative Deputy, Senior (Deputy Director) for the Division of Detention. This role expanded my administrative duties significantly, and I played a pivotal role in the planning, design, and construction of a detention facility with a capacity exceeding 1,000 inmates, incorporating the principles of Objective Jail Classification alongside Direct Supervision.

Throughout my career, I have continued to fulfill the responsibilities of a Deputy Jailer, often assuming multiple roles concurrently. While the frequency of these duties varied over time, they were gradually reduced as my supervisory responsibilities within the agency expanded. In 2001, I assumed additional responsibilities for the development and management of contracts for privatized services, which included food, medical, mental health, commissary, and inmate telephone services, along with overseeing various other projects. By 2004, I was tasked with developing and supervising the Bureau of Professional Standards within the Lexington-Fayette Urban County Division of Community Corrections. This encompassed Internal Affairs; Safety, Sanitation and Standards; and the administration of Administrative and Disciplinary Hearings. I retired from my position in August 2008.

EXHIBIT D

My consulting endeavors commenced in the early 1990s. I have held certification as an instructor of correctional curricula since 1985. Additionally, I am certified as a firearms instructor by the Federal Bureau of Investigation (FBI) and as a defensive tactics instructor by the Federal Bureau of Prisons (BOP). Since 1990, I have provided instruction and consultation for the National Institute of Corrections (NIC), and since 2004, for the American Jail Association (AJA), among other criminal justice consulting entities. I have assisted in the formulation of policies and procedures for jails across the country and conducted evaluations of classification systems in jails of varying sizes for the NIC and other contractors.

My expertise spans a wide range of jail management areas, including the use of force, security and operations, medical and mental health service provision, classification, inmate behavior management, contract management for privatized services, management information systems, strip searches, and the management of gangs and security threat groups within jails. I co-developed a novel jail management paradigm known as Mission-Based Management. My academic qualifications include a Bachelor's degree in General Studies with a focus on Social and Political Theory and a Doctorate in Public Administration.

I am a member of the American Jail Association and have served on the Board of Directors as the Second Vice-President on the Executive Board. I am also involved with Americans for Effective Law Enforcement (AELE) as a faculty member and Board of Directors member, and I instruct on a variety of correctional topics including inmate classification, in-custody death prevention, the use of force in corrections, correctional facility design and operation, and the Prison Rape Elimination Act. I also serve on the Board of Directors and as a faculty member of the Institute for the Prevention of In-Custody Deaths (IPICD).

In recent years, I have engaged in litigation consultation and expert witness roles for both plaintiffs and defendants, primarily concerning issues such as strip search, classification, use of force, medical care, in-custody deaths, jail design and operations, and conditions of confinement. I provide expert opinions within a reasonable degree of professional certainty on matters related to jail and prison correctional issues, accepted correctional practices, and correctional administration and supervision.



EXHIBIT D

## III. PUBLICATIONS

1. "A New Strip Search Paradigm," Leach, Donald and Sabbatine, Ray, American Jails, Hagerstown: November/December 1996
2. "Are Tasers in Jails a Great New Tool or Another Headache," LJN Exchange, National Institute of Corrections, US Department of Justice, 2006
3. "Arrestee Strip Searches: An Administrator's View," Correctional Law Reporter, July/August 2010
4. "Carrots versus Sticks: Managing Behavior in the Jail," American Jails, Hagerstown: November/ December 2008 and Correctional Managers Report, April/May 2008
5. "Creating a New Jail Management Paradigm," Kennedy-Western University, Published Dissertation, 2004
6. "Excited Delirium: Fact or Fiction," LJN Exchange, National Institute of Corrections, US Department of Justice, 2007
7. "Issues Surrounding Managing Lesbian, Gay, Bi-sexual, Transsexual, and Intersex Offenders (LGBTI) in Jails," American Jails, Hagerstown: November/December 2007; LJN Exchange, National Institute of Corrections, US Department of Justice, 2006; and, Corrections Professional, November 2007
8. "Journey into Objective Jail Classification," Leach, Don and Sabbatine, Ray, American Jails, Hagerstown: January 1999
9. "Mission Creep and the Role of the Jail in Public Health Policy," LJN Exchange, National Institute of Corrections, US Department of Justice, 2004
10. "PREA Draft Standards are PREA 'DAFT" Standards," Correctional Managers Report, August 2008
11. "PREA Redux: What's It Going to Cost Us?," American Jails, Hagerstown: May/June 2010
12. "PREA Redux: What's It Going to Cost?" Correctional Law Reporter, December/January 2010
13. "Prison Rape Elimination Act Lives On," Correctional Managers Report, December/January 2009
14. "The Use of Force Continuum: Is it Worth Keeping?" (Part 1), Collins, William; Swartz, Jeffrey; and Leach, Donald, Correctional Law Reporter, December/January 2011
15. "The Use of Force Continuum: Is it Worth Keeping?" (Part 2), Collins, William; Swartz, Jeffrey; and Leach, Donald, Correctional Law Reporter, May/June 2011



EXHIBIT D

## IV. COMPENSATION

My retainer is $5,000.00. The rate of compensation is $250.00 per hour for document and materials review, research, consultation. Expert reports will be completed at the rate of $250 per hour, which will be in addition to the minimum file review fee of $5,000. The fee for depositions is $2,500.00 for the first 5-hours and $400 per hour for any subsequent time (video depositions are $3500 for the first 5-hours and $400 per hour for any subsequent time) with a maximum of seven (7) hours of testimony per day. Trial testimony is $3,500.00 for each day or portion of a day testifying. Site visits or days waiting to testify are billed at $1,000.00 per day plus all reasonable expenses (hotel, travel, rental vehicle, meals, printing, and duplication). Fees for travel, deposition, awaiting trial, and trial testimony require payment in advance of the event



EXHIBIT D

## V. CASE HISTORY DISCLOSURE

Cases in which I have testified in court or deposition in the past four years:

1. *Estate of Charles Lee Rose v. Wayne Co Fiscal Court, et al.,* Wayne County Circuit Court, Case No: 16-CI-00265 (10/2024) **Defense-In-custody Death**

2. *Estate of Dean Funabiki by and through personal representative, Rich Funabiki, Abby Funabiki and Emily Funabiki, ,v. County of Whitman; John Doe 1 and Does 4–5,* U.S. District Court, Eastern District of Washington, Case No. 2:21-CV-00089-RMP (05/2024) **Defense-Suicide**

3. *Frances Beach, as Administrator of The Estate of Eric Griffith v. William Grady, in his individual capacity, Curtis Thompson, in his individual capacity, Michael Pittman, in his individual capacity, Wayne Coats, in both his individual capacity and his official capacity as Sheriff OF Harnett County, North Carolina, Harnett County, and Travelers Casualty and surety Company of America,, as Surety for the Sheriff of Harnett County,* U.S. District Court, Eastern District of North Carolina, Western Division, Civil Action No. 5:23-CV-329-D-RN (05/2024) **Plaintiff-In-custody Death**

4. *Estate of Madison Jody Jensen v. Duchesne County, David Boren, Jared Harrison, Jason Curry, Jana Clyde, Logan Clark and John Does 1-20,* U.S. District Court, District of Utah, Central Division, Civil No. 2:17-cv-01031 (03/2024) **Plaintiff-In-custody Death**

5. *Deea Miller, Administrator of the Estate of Kacey Miller v. Vermillion County, John Doe Sheriff's Deputies 1-4, Crosspoint Human Services, John Doe employees 1-3, and James Dewey, U.S.* District Court, Central District of Illinois, Urbana Division, Case No. 22-cv-2029-CRL-KLM (03/2024) **Defense-Suicide**

6. *Jerry Sanford and Stephanie McClure, Co-Administrators of the Estate of Jonathan Sanford v. Dawson County Sheriff Jeff Johnson, Dawson County Sheriff's Deputies and/or Jailer Zachary Totherow, Donald S. Lewis, Stephen D. Holloway, William D. Johnson, Michael A. Wharton, Madison A. Elder, David Lingerfelt, and Theresa Kirby,* U.S. District Court, Northern District of Georgia, Gainesville Division, Civil No. 2:22-cv-00078-RWS (03/2024) **Plaintiff-In-custody Death**

7. *Bobby Joe Poynter v. Whitley County Detention Center, Whitley County Fiscal Court, Brian Lawson, Steve Claxton, and Bobby Chancellor,* U.S. District Court, Eastern District of Kentucky, Southern Division at London, 6:21-cv-00058-KKC (01/2023) **Defense-Use of Force**

8. *Katrina Woodall, Katana Johnston, Kelly Davis, and LaToya Hearst, v. Wayne County and Officer Teri Graham,* U.S. District Court, Eastern District of Michigan, Number 2:17-cr-13707-LJM-EAS (01/2023) **Plaintiff-Strip Search**

9. *Nicole DeSimone v. Flagler County, Rick Staley, Steve Cole, Becky Quintieri, Bradley Gilyard, Julio Vazquez, and Jonathan Vitale,* U.S. District Court, for the Middle District of Florida, Jackson Division, 3:20-cv-1242-TJC-MCR (12/2022) **Defense-Facility Design**

10. *United States of America v. Seth Bourget and Joseph M. Lavorato,* U.S. District Court, District of Massachusetts, Number 1:20-cr-10029-DJC (03/2022) **Prosecution-Use of Force-Criminal Civil Rights Trial**



EXHIBIT D

11. *People of the State of Colorado, v. Andrew McCormick,* County Court, Adams County, Colorado, C0012020M004010 (11/2021) **Defense-Use of Force-Criminal Trial**

12. *People of the State of Colorado, v. Walter Berlinski,* County Court, Adams County, Colorado, 2019CR4494 (10/2021) **Defense-Use of Force-Criminal Trial**

13. *Brian Johnson v. Mike Dobbins, et al.,* U.S. District Court, Middle District of Tennessee, Nashville Division, 3:19-CV-01160 (10/2021) **Defense-ADA Issues/Conditions of Confinement**

14. *Tom Montgomery, et al., v. King County, et al.,* U.S. District Court, Western District of Washington at Seattle, 20-cv-00855-RAJ (10/2021) **Defense-Suicide**

15. *Omar Wesley v. Wisconsin Community Services, et al.,* U.S. District Court, Eastern District of Wisconsin, 19-cv-00918 (09/2021) **Defense-Medical Care/Community Supervision**

16. *Nick J. Epps v. Gary Ferguson, et al.*, Bell Circuit Court, Commonwealth of Kentucky, 17-CI-00388 (07/2021) **Plaintiff-Medical Care**

17. *Estate of Brianna Lynn Beland v. Charleston County Sheriff's Office, et al.,* Court of Common Pleas, Charleston, 2019-CP-10-1809 (06/2021) **Defense-Medical Care/In-custody Death**

18. *S.L.C., S.E.R., S.A.L.M. v. Polk County Sheriff's Department and Darryl Christensen*, U.S. District Court, Western District of Wisconsin, 3:16-cv-00630-WMC, 3:16-cv-00631-WMC and 3:16-cv-00632-WMC (04/2021) **Defense-Failure to Protect/PREA Issues**

19. *Carol Herriges v. County of Macomb, et al.,* U.S. District Court, Eastern District, 19-cv-12193 (11/2020) **Plaintiff-Suicide**

20. *Pia Sacchetta v. Lake County Sheriff, Peyton C. Grinnell, et al.,* Circuit Court of the Fifth Judicial Circuit, Lake County, Florida, 5:19-cv-00561-JSM-PRL (10/2020) **Plaintiff-Medical Care/In-custody Death**

21. *Amy Hill v. Okmulgee County Criminal Justice Authority, et al.,* U.S. District Court of Oklahoma, Eastern District, 18-394-SPS (05/2020) **Plaintiff-Use of Force**

22. *Joshua Reece v. Shelby County, Kentucky D/B/A Shelby County Detention Center, et al.,* U.S. District Court, Eastern District of Kentucky, Frankfort Division, 3:16-cv-69-GFVT (03/2020) **Defense-Staff Misconduct**

23. *Euron Matthew v. Jake Debus, et al.,* U.S. District Court, Northern District of Illinois, Eastern Division, 1:14-cv-06003 (02/2020) **Plaintiff-Use of Force**

24. *Kevin Younger v. Jemiah L. Green,* U.S. District Court, District of Maryland, 24-C-17-0047S2 OC (01/2020) **Plaintiff-Use of Force/Staff Misconduct**

25. *Euron Matthew v. Jake Debus, et al.,* U.S. District Court, Northern District of Illinois, Eastern Division, 1:14-cv-06003 (01/2020) **Plaintiff-Use of Force**



EXHIBIT D

## VI. MATERIALS REVIEWED

I reviewed the following materials in formulating my opinion in this case

1. 2023 Annual Report-Corrections-Okaloosa County Department of Corrections, Florida Corrections Accreditation Commission dated 12/06/2022
2. Annual Jail Inspection, Florida Model Jail Standards
    2.1. Dated 02/12/2019
    2.2. Dated 03/13/2020
    2.3. Dated 10/12/2021
    2.4. Dated 04/18/2022
3. Annual Medical Inspection, Florida Model Jail Standards
    3.1. Dated 04/16/2019
    3.2. Dated 03/13/2020
    3.3. Dated 09/21/2021
    3.4. Dated 04/18/2022
4. Call History Record, Okaloosa County Sheriff's Office
    4.1. Number OCSO22CAD000403, dated 01/01/2022; 1730 hours
    4.2. Number OCSO22CAD000442, dated 01/01/2022; 1852 hours
5. Cell Assignment History-Chestnut, James dated 09/19/2023; 0901 hours
6. Cell Assignment History from 12/19/2021; 00:00 to 01/04/2021; 23:59 printed 09/19/2023; 09:09 printed 09/19/2023; 0909 hours
7. Certification of Death dated 01/10/2022
8. Combined CDR Summary Report dated 08/05/2022; 0816 hours
9. Complaint filed 03/07/2024 (3:24-cv-00100-TKW-ZCB)
10. Confidential Report-Chestnut, James Bryant generated: 10/05/2023; 1230 hours
11. Contract for RFP 47-19, "Inmate Medical Services for Okaloosa County Department of Corrections Public Safety," Corizon Health, Inc. dated 09/03/2019
12. Daily Activity Log
    12.1. Charlie Pod
        12.1.1. Dated 12/25/2021; 0001 hours to 2359 hours
        12.1.2. Dated 12/26/2021; 0001 hours to 2400 hours
        12.1.3. Dated 12/27/2021; 0001 hours to 0000 hours



EXHIBIT D

12.1.4. Dated 12/28/2021; 0001 hours to 2400 hours

12.1.5. Dated 12/29/2021; 0001 hours to 2325 hours

12.1.6. Dated 12/30/2021; 0001 hours to 2400 hours

12.1.7. Dated 12/31/2021; 0001 hours to 2400 hours

12.1.8. Dated 01/01/2022; 0001 hours to 2400 hours

12.1.9. Dated 01/02/2022; 0001 hours to 2400 hours

12.2. Delta Pod

12.2.1. Dated 12/10/2021; 0001 hours to 2400 hours

12.2.2. Dated 12/20/2021; 0001 hours to 2400 hours

12.2.3. Dated 12/21/2021; 0001 hours to 2400 hours

12.2.4. Dated 12/22/2021; 0001 hours to 2400 hours

12.2.5. Dated 12/23/2021; 0001 hours to 2400 hours

12.2.6. Dated 12/24/2021; 0001 hours to 2400 hours

12.2.7. Dated 12/25/2021; 0001 hours to 2400 hours

13. Defendant, Clinton Colbert's Response to Plaintiff First Set of Interrogatories to Defendant dated 10/26/2024

14. Defendant, Derrick Hopkin's Response to Plaintiff First Set of Interrogatories to Defendant dated 10/26/2024

15. Defendant, Felix Zullo's Response to Plaintiff First Set of Interrogatories to Defendant dated 10/26/2024

16. Defendant, James Filpi's Response to Plaintiff First Set of Interrogatories to Defendant dated 10/26/2024

17. Defendant, Richard Pinkham's Response to Plaintiff First Set of Interrogatories to Defendant dated 10/26/2024

18. Defendant, Stanley Chopp's Response to Plaintiff First Set of Interrogatories to Defendant dated 10/26/2024

19. Defendant, Steven Barcelo's Response to Plaintiff First Set of Interrogatories to Defendant dated 10/26/2024

20. Defendant, Zachary Miller's Response to Plaintiff First Set of Interrogatories to Defendant dated 10/26/2024

21. Department Directives, Okaloosa County Department of Corrections



EXHIBIT D

21.1. "Admissions, Classification, and Release," "Admissions Policy," Number 28 effective 04/20/2023

21.2. "Classification Standards," "Classification Policy," Number 29 effective date 04/25/2021

21.3. "Complaints and Internal Investigations," "Internal Investigations," Number 04 effective date 02/22/2023

21.4. "Establishing Safe and Effective emergency Plans," "Emergency Plans," Number 39 effective date 06/01/2022

21.5. "Foundations of Officer Training," "Training," Number 05 effective date 12/01/2022

21.6. "Inmate Housing," "Inmate Housing Policy," Number 16 effective date 02/24/2023

21.7. "Medical Operations and Procedures," "Medical-Correctional Policy," Number 34 effective date 10/13/2020

21.8. "Post Officer Roles and Responsibilities," "Officer Post Policy," Number 38, effective date 09/09/2021

21.9. "Shift Supervision Procedures," "Shift Supervision Policy," Number 36 effective date 08/09/2021

22. Diagram-Charlie Pod

23. End of Shift Reports

23.1. Alpha Unit

23.1.1. Dated 12/20/2021

23.1.2. Dated 12/21/2021

23.1.3. Dated 12/24/2021

23.1.4. Dated 12/25/2021

23.1.5. Dated 12/26/2021

23.1.6. Dated 12/29/2021

23.1.7. Dated 12/30/2021

23.2. Bravo Shift

23.2.1. Dated 12/19/2021

23.2.2. Dated 12/22/2021

23.2.3. Dated 12/23/2021

23.2.4. Dated 12/27/2021

23.2.5. Dated 12/28/2021

23.2.6. Dated 12/31/2021

23.2.7. Dated 01/01/2022

23.2.8. Dated 01/02/2022

23.3. Charlie Unit

23.3.1. Dated 12/19/2021

23.3.2. Dated 12/22/2021

23.3.3. Dated 12/23/2021

23.3.4. Dated 12/25/2021

23.3.5. Dated 12/26/2021

23.3.6. Dated 12/27/2021

23.3.7. Dated 12/28/2021

23.3.8. Dated 12/31/2021

23.3.9. Dated 01/01/2022

23.3.10. Dated 01/02/2022

23.4. Delta Unit

23.4.1. Dated 12/19/2021

23.4.2. Dated 12/21/2021

23.4.3. Dated 12/24/2021

23.4.4. Dated 12/25/2021

23.4.5. Dated 12/26/2021

23.4.6. Dated 12/29/2021

23.4.7. Dated 12/30/2021

24. Expert Report-Hough, Richard, Dr. dated 10/04/2024

25. FIBRS Incident Report, Number OCSO22OFF000039-Barnhill, Wesley dated 01/01/2022; 2252 hours

26. First Amended Complaint filed 07/26/2024

27. "Full Assessment Report-Okaloosa County Department of Corrections," Florida Corrections Accreditation Commission, Inc

27.1. Dated 08/30/2016

27.2. Dated 08/09/2019

27.3. Dated 07/27/2022

28. General Orders, Okaloosa County Department of Corrections

28.1. "Medical-Correctional Policy," Number 34, General Order, effective date 10/13/2020

28.2. "Radio Procedures," Number 06, General Order effective date 03/01/2020

28.3. "Training," Number 05, General Order effective date 04/05/2021

29. Health Services Accreditation Report, National Commission on Correctional Healthcare dated 10/31/2021

30. Inmate Rules and Regulations Handbook

31. Jail Records-Chestnut, James Bryant

31.1. 48 Hour Worksheet-Civil Commitment Orders dated 12/19/2021

31.2. Arresting/Transporting Officer Questionnaire dated 12/19/2021

31.3. Arrest History Report dated 08/20/2024; 1218 hours

31.4. Arrest Report, Report Number OCSO21ARR012022 dated 12/19/2021; 0340 hours

31.5. Bond Conditions dated 12/20/2021

31.6. Booking Report dated 12/19/2021; 0539 hours

31.7. Commitment Served

31.7.1. Report Number OCSO21ARR011658 dated 12/19/2021

31.7.2. Report Number OCSO21ARR010445 dated 12/19/2021

31.8. Ex-Parte Order Recalling and Dismissing Duplicate Writ of Bodily Attachment dated 12/20/2021; 1552 hours

31.9. Fingerprint Cards undated

31.10. New Inmate Covid-19 Screening Tool dated 12/19/2021

31.11. Property Items

31.11.1. Dated 12/19/2021; 0318 hours

31.11.2. Dated 01/02/2022; 0841 hours

31.12. Record of First Appearance undated

31.13. Release Procedure Checklist dated 01/01/2021

31.14. Release Report dated 01/01/2021; 0059 hours

31.15. Sentence Computation Form dated 12/19/2021; 1220 hours

31.16. Security-Medical Screening dated 12/19/2021

31.17. Writ of Bodily Attachment

31.17.1. Dated 10/22/2021; 1314 hours

31.17.2. Dated 12/07/2021; 1450 hours



EXHIBIT D

32. Jail Records-Fernandez, Joe
33. Medical Examiner Report, Final Diagnosis and Findings, Gallagher, Timothy J., MD dated 01/05/2022
34. Medical Records-Chestnut, James Bryan
    - 34.1. Arresting/Transporting Officer Questionnaire dated 12/19/2021
    - 34.2. Authorization for Release of Protected Health Information dated 12/19/2021; 0430 hours
    - 34.3. Condensed Health Services Encounters
        - 34.3.1. Dated 12/19/2021; 0426 hours (Intake Screening)
        - 34.3.2. Dated 12/25/2021; 1628 hours (Chest Pain)
        - 34.3.3. Dated 12/29/2021
            - 34.3.3.1. 1346 hours (Mental Health Evaluation)
            - 34.3.3.2. 1343 hours (Sick Call-Knee Pain)
            - 34.3.3.3. 1000 hours (Initial Health Assessment)
            - 34.3.3.4. 0500 hours (PPD)
        - 34.3.4. Dated 01/01/2022; 1748 hours (Medical emergency)
    - 34.4. Dental and Mouth Care undated
    - 34.5. Drug Prescription Orders
    - 34.6. General Consent to Medical Services dated 12/19/2021; 0430 hours
    - 34.7. Health Assessment-History dated 12/29/2021; 1003 hours
    - 34.8. Health Assessment-Physical dated 12/29/2021; 1004 hours
    - 34.9. Health Problems/Conditions
    - 34.10. Health Services Request Form dated 12/25/2021
    - 34.11. Intake and Receiving Screening dated 12/19/2021; 0430 hours
    - 34.12. Medication Administration Records (MAR)
        - 34.12.1. December, 2021
        - 34.12.2. January, 2022
    - 34.13. New Inmate Covid-19 Screening tool dated 12/19/2021
    - 34.14. Notification of Diagnostic Results dated 01/02/2022
    - 34.15. Radiology Report, Tech Care X-Ray-Lin, Ho, MD dated 12/30/2021; 0823 hours
    - 34.16. Release of Personal Health Information Family and Friends dated 12/19/2021
    - 34.17. Refusal of Clinical Services dated 12/29/2021: 0900 hours (Mental Health Intake)

34.18. Screening undated

34.19. Security-Medical Screening dated 12/19/2021; 0310 hours

34.20. Special Needs/Treatments/Diets dated 12/29/2021 (Wheelchair, Work Clearances)

34.21. Vital Signs

34.21.1. Dated 12/19/2021; 0438 hours

34.21.2. Dated 12/29/2021; 1001 hours

34.22. X-Rays/EKGs dated 12/29/2021

35. Photographs-Chestnut, James Bryan (Glassman/Okaloosa 002898-003017)

36. Plaintiff's Answers to Defendant's Initial Interrogatories filed06/07/2024

37. Plaintiff's Investigator Interviews

37.1. McLeod, Anthony dated 11/29/20

37.2. Roca, Anthony dated 12/12/2023; 0912 hours

38. Plaintiff's Response to Defendant's Initial Requests for Production of Do cement filed06/07/2024

39. Plaintiff's Rule 26(a)(2) Disclosures filed 08/15/2024

40. Prisoner Movement Logs

40.1. Bravo Unit dated 12/21/2021

40.2. Charlie Unit

40.2.1. Dated 12/21/2021

40.2.2. Dated 12/25/2021

40.2.3. Dated 12/26/2021

40.2.4. Dated 12/27/2021

40.2.5. Dated 12/28/2021

40.2.6. Dated 12/29/2021

40.2.7. Dated 12/30/2021

40.2.8. Dated 12/31/2021

40.2.9. Dated 01/02/2022

40.3. Delta Unit

40.3.1. Dated 12/19/2021

40.3.2. Dated 12/20/2021

40.3.3. Dated 12/21/2021

40.3.4. Dated 12/22/2021

40.3.5. Dated 12/23/2021

40.3.6. Dated 12/24/2021

40.3.7. Dated 12/25/2021

41. Resident Debt printed 11/03/2023

42. Training Records

42.1. Barcelo, Steven L

42.1.1. Affidavit of Applicant dated 03/07/2017

42.1.2. Basic Recruit Certificate dated 11/17/2014

42.1.3. Certificates Report-Awarded between 07/01/2015 and 05/22/2019

42.1.4. Corrections Prohibited Harassment Refresher Training 02/04/2019, 02/06/2019

42.1.5. Employee Training Data received 05/21/2019

42.1.6. Global Profile sheet, Florida Department of Law Enforcement

42.1.6.1. Dated 01/18/2017

42.1.6.2. Dated 03/10/2017

42.1.6.3. Dated 05/24/2019

42.1.7. Law Enforcement Officer Firearms Qualifications Standard dated 11/13/2018

42.1.8. Mandatory Retraining Report dated 03/15/2019

42.1.9. Prohibited Harassment Training dated 03/07/2017

42.1.10. Resume received 01/20/2017

42.2. Chopp, Stanley

42.2.1. Adult CPR/AED dated 03/27/2020

42.2.2. Basic Recruit Certificate dated 08/27/1997

42.2.3. Certificates Report-Awarded between 07/01/2014 and 04/13/2018

42.2.4. Corrections Prohibited Harassment Refresher Training 02/04/2019, 02/06/2019

42.2.5. Employee Training Data received 04/16/2013

42.2.6. Facility Training Officer (FTO) Critique Form

42.2.6.1. Dated 10/21/2022

42.2.6.2. Dated 11/04/2022

42.2.6.3. Undated



EXHIBIT D

42.2.7. Firearms Qualification and Proficiency Review

42.2.7.1. Dated 11/16/2021

42.2.7.2. Dated 01/10/2023

42.2.8. Global Profile sheet, Florida Department of Law Enforcement

42.2.8.1. Dated 05/17/2017

42.2.8.2. Dated 11/15/2023

42.2.8.3. Dated 04/19/2018

42.2.8.4. Dated 07/19/2022

42.2.9. Interpersonal Communication Skills with Correctional Offenders - Course 3 dated 10/05/2019

42.2.10. Law Enforcement Officer Firearms Qualifications Standard

42.2.10.1. Dated 12/11/2018

42.2.10.2. Dated 11/07/2019

42.2.11. Mandatory Retraining Report

42.2.11.1. Dated 04/19/2018

42.2.11.2. Dated 05/11/2022

42.2.12. Middle Management dated 06/14/2023

42.2.13. Performance Feedback & Coaching Training dated 02/21/2024

42.2.14. Policies Reviewed Form

42.2.15. Principles of supervision dated 03/07/2024

42.2.16. Prohibited Harassment for Supervisors dated 04/26/2023

42.2.17. Prohibited Harassment Training dated 06/13/2017

42.2.18. Sexual Harassment Awareness for Supervisors dated 11/22/2022

42.2.19. TASER® Conducted Energy Weapon (CEW), New User Applicant Certification Form dated 08/05/2021

42.2.20. Workplace Violence: ALICE & Stop the Bleed dated 03/20/2024

42.3. Colbert, Clinton

42.3.1. Adult CPR/AED dated 02/01/2019

42.3.2. Advance Report Writing and Review dated 12/02/2019

42.3.3. Basic Recruit Certificate dated 01/24/2011

42.3.4. Basic Incident Command System for Initial Response dated 03/10/2020



EXHIBIT D

42.3.5. Case Preparation And Court Presentation dated 02/07/2019

42.3.6. Certificates Report-Awarded between 07/01/2015 and 05/22/2019

42.3.7. Corrections Prohibited Harassment Refresher Training 02/04/2019, 02/06/2019

42.3.8. Diversity on the Job: Diversity and You dated 10/11/2019

42.3.9. Field Training Officers Techniques Course dated 12/06/2018

42.3.10. Global Profile sheet, Florida Department of Law Enforcement

42.3.10.1. Dated 12/14/2018

42.3.10.2. Dated 07/29/2015

42.3.10.3. Dated 11/06/2015

42.3.10.4. Dated 03/04/2019

42.3.10.5. Dated 05/22/2019 x2

42.3.11. Interpersonal Communication Skills wit/, Correctional Offenders - Course 3 dated 10/16/2019

42.3.12. Interview and Interrogations dated 11/08/2018

42.3.13. Introduction to Incident Command System, ICS-100 dated 03/10/2020

42.3.14. Law Enforcement Officer Firearms Qualifications Standard

42.3.14.1. Dated 10/24/2018

42.3.14.2. Dated 10/14/2019

42.3.15. L.E.A.D. (Class A, Session 1) dated 05/10/2023

42.3.16. Level 1 CJIS Security Test dated 02/09/2016

42.3.17. Mandatory Retraining Report dated 05/22/2019

42.3.18. Organized Crime Course dated 04/18/2019

42.3.19. PREA: Your Role Responding to Sexual Abuse dated 04/02/2018

42.3.20. Prohibited Harassment Training dated 11/03/2015

42.3.21. Stress Management Techniques dated 01/17/2019

42.4. Filpi, James

42.4.1. Adult CPR/AED dated 08/10/2018

42.4.2. Affidavit of Compliance dated 12/21/2015

42.4.3. Basic Recruit Certificate dated 01/24/2011

42.4.4. Certificates Report-Awarded between 07/01/2016 and 01/25/2020



EXHIBIT D

42.4.5. Corrections Prohibited Harassment Refresher Training 02/04/2019, 02/06/2019

42.4.6. Diversity on the Job: Diversity and You dated 10/13/2019

42.4.7. Firearms Qualification and Proficiency Review

42.4.7.1. Dated 11/13/2018

42.4.7.2. Dated 11/07/2019

42.4.7.3. Dated 11/09/2021

42.4.7.4. Dated 01/12/2023

42.4.8. Global Profile sheet, Florida Department of Law Enforcement

42.4.8.1. Dated 08/31/2017

42.4.8.2. Dated 09/26/2017

42.4.8.3. Dated 10/13/2017

42.4.8.4. Dated 04/22/2020

42.4.9. ICS for Single Resources and Initial Action Incident, ICS-200 dated 12/19/2018

42.4.10. Interpersonal Communication Ski/Ls with Correctional Offenders - Course 3 dated 10/13/2019

42.4.11. Phase II-Daily Operations Reports dated 11/20/2017

42.4.12. Policies Reviewed Form

42.4.13. Prohibited Harassment Training dated 04/22/2020

42.4.14. TASER® Conducted Energy Weapon (CEW), New User Applicant Certification Form dated 09/07/2022

42.5. Hopkins, Derrick

42.5.1. Acknowledgement of Okaloosa County BCC Safety and Risk Manual dated 11/05/2021

42.5.2. Adult CPR/AED dated 04/10/2023

42.5.3. Basic Recruit Certificate dated 01/06/2021

42.5.4. Basic Recruit Training Program dated 11/07/2020

42.5.5. Firearms Qualification and Proficiency Review

42.5.5.1. Dated 11/02/2021

42.5.5.2. Dated 01/12/2023

42.5.6. Global Profile sheet, Florida Department of Law Enforcement

42.5.6.1. Dated 07/29/2021



EXHIBIT D

42.5.6.2. Dated 10/12/2021

42.5.6.3. Dated 10/19/2021

42.5.7. OCBCC Employee Training Checklist dated 11/08/2021

42.5.8. Police Reviewed Form

42.5.9. Prohibited Harassment Training Acknowledgement dated 10/18/2021

42.5.10. State Officer Certification Examination Results dated 12/05/2020

42.6. Miller, Zachary

42.6.1. Affidavit of Compliance dated 03/23/2020

42.6.2. Correctional Officer Basic Recruit Training Course dated 08/09/2018

42.6.3. Diversity on the Job: The Importance of Diversity and the Changing Workplace dated 04/13/2020

42.6.4. Firearms Qualification and Proficiency Review dated 10/26/2021

42.6.5. Global Profile sheet, Florida Department of Law Enforcement

42.6.5.1. Dated 10/15/2019

42.6.5.2. Dated 10/30/2019

42.6.5.3. Dated 11/27/2019

42.6.5.4. Dated 03/12/2020

42.6.5.5. Dated 03/25/2020

42.6.6. Interpersonal Communication Skills with Correctional Offenders - Course 3 dated 04/13/2020

42.6.7. IS-00100.c Introduction to Incident Command System, ICS-100 dated 03/26/2020

42.6.8. IS-00200.c Basic Incident Command System for Initial Response dated 03/30/2020

42.6.9. PREA: Your Role Responding to Sexual Abuse dated 04/13/2020

42.6.10. Policies Reviewed Form

42.6.11. Prohibited Harassment Training dated 03/23/2020

42.7. McNulty, Stephanie

42.7.1. Adult CPR/AED dated 05/23/2020

42.8. Mersino, Rome

42.8.1. Adult CPR/AED dated 05/02/2019

42.9. Pinkham, Richard

42.9.1. Adult CPR/AED dated 09/02/2022



EXHIBIT D

42.9.2. Courses completed for Employee dated 11/07/2022; 1046 hours

42.9.3. Firearms Qualification and Proficiency Review

42.9.3.1. Dated 11/02/2021

42.9.3.2. Dated 12/13/2022

42.9.4. Policies Reviewed Form

43. Transcript of Video Recordings Regarding James Chesnut (Deceased)

43.1. Colbert, Clinton

43.2. Fernandez, Joe

43.3. Filpi, James

43.4. McLeod, Anthony (Anthony 1) and Roca, Anthony (Anthony 2)

43.5. White, Jessica-LPN and Stout, Tanya-LPN

44. Verified Medical Opinion-Fournier, Arthur Michael, MD dated 03/11/2024

45. Verified Medical Opinion-Minter, Susan, DNP, ARPN dated 06/06/2024

46. Video Recordings-Body Cameras

46.1. Cell Search, Charlie Unit, Cell F3 dated 01/02/2022 from 03:28:58 to 03:33:12 (Butler, J.)

46.2. Charlie Unit, Cell F3 dated 01/02/2022 from 00:11:44 to 00:12:38 (Blake, M.)

46.3. Interview-Inmate Fernandez, Joe dated 01/02/2022 from 04:03:40 to 04:08:50 (Henderson, K.)

46.4. Interview-Inmates McLeod, Anthony and Roca, Anthony dated 01/02/2022 from 03:48:30 to 03:58:42 (Henderson, K.)

46.5. Interview-LPNs White, Jessica and Stout, Tanya dated 01/02/2022 from 01:07:07 to 01:20:20 (Butler, J.)

46.6. Interview-Officer Colbert, Clinton dated 01/02/2022 from 01:50:34 to 01:59:07 (Butler, J.)

46.7. Interview-Officer Filpi, James dated 01/02/2022 from 01:35:53 to 01:49:39 (Butler, J.)

47. <u>Core Jail Standards</u>, 1st Edition, American Correctional Association, 2010

48. <u>DiMaio's Forensic Pathology-Third Edition</u>, Vincent J.M. DiMaio, MD and D.Kimberley Molina, MD, 2022

49. <u>Jail and Prison Legal Issues: An Administrator's Guide</u>, William Collins, Esq., published by the American Jail Association, updated 2006

50. "Evaluation of Postmortem Changes," Almulhim AM, Menezes RG. StatPearls: Treasure Island, FL, StatPearls Publishing; 01/2024 accessed at https://www.ncbi.nlm.nih.gov/books/NBK554464/

51. "Florida Model Jail Standards," Florida Sheriff's Association effective Date: 04/01/20213



EXHIBIT D

52. "Methods of Estimation of Time Since Death," Shrestha R, Kanchan T, Krishan K. In: StatPearls StatPearls Publishing: Treasure Island (FL); 01/2024 accessed at https://www.ncbi.nlm.nih.gov/books/NBK549867/

53. Performance-based Standards for Adult Local Detention Facilities (ALDF)

    53.1. 4th Edition, American Correctional Association, June 2004

        53.1.1. 2014 Standards Supplement, American Correctional Association, 2014

    53.2. 5th Edition, American Correctional Association, May 2023

54. Standards for Health Services in Correctional Institutions, 3rd Edition, American Public Health Association, 2003

55. Standards for Health Services in Jails, National Commission on Correctional Health Care, 2008

56. The Essential of Forensic Medicine and Toxicology, Dr. K.S. Narayan Reddy, MD, DCP, PhD, FAMS, FIMSA, FAFSc, FIAMS, FAFM and Dr. O.P. Murty, MD, Additional Professor of Forensic Medicine, 33rd Edition, 2014

57. The Supreme Court and Corrections: The Landmark Cases That Have Shaped America's Prisons and Jails, William Collins, Esq., published by the Civic Research Institute, 2019

58. *Bell v. Wolfish*, 441 U.S., 520 (1979)

59. *Estelle v. Gamble*, 429 U.S. 97; 97 S. Ct. 285; 50 L. Ed. 2d 251; 1976 U.S. LEXIS 175, (1976)

60. *Farmer v Brennan*, (92-7247), 511 U.S. 825 (1994)

61. *Florence v. Board of Chosen Freeholders of County of Burlington et al.*, 566 U.S. 318 (2012)

62. *Kingsley v. Hendrickson*, No. 14-6368, U.S., 135 S. Ct. 2466, 2015 U.S. LEXIS 4073 (2015)

63. *Procunier v. Martinez*, 416 U.S. 396, 412 (1974)

64. *Turner v. Safley*, 482 U.S. 78 482 U.S. 78 (1987)



EXHIBIT D

## VII. EXHIBITS TO BE USED TO SUMMARIZE OR SUPPORT OPINIONS

I may employ some or all the materials referred to in the previous section to summarize or support my opinions. In addition, I may utilize demonstrative evidence at trial that can explain or illustrate issues in this case. This report is predicated on the facts presented by reviewing the provided materials. Attempts are made to avoid making judgments based solely upon the involved individual's credibility. *I reserve the right to alter my opinions and conclusions as necessary should additional information be disclosed that impacts my opinions and conclusions.*

## VIII. FOCUS OF EXAMINATION

My review focused on the following issue:

***A. This rebuttal provides an analysis of the defense expert's report on the care and custody of Mr. James Bryan Chestnut at the Okaloosa County Department of Corrections on January 1, 2022. It addresses omissions and oversights in the defense's conclusions related to standard correctional protocols and the duty of care for inmates.***

## IX. OPINION

My opinion is predicated on a comprehensive review of the information listed in Section VI. My opinions are given with reasonable professional certainty in those areas involving jail and correctional issues, generally acceptable correctional practice, supervision, and administration. I reserve the right to supplement or alter my opinion should additional information be received

***A. In my opinion, the defense expert, Dr. Richard Hough, failed to include critical information in his analysis that demonstrates the staff's failure to provide appropriate care and custody to Mr. James Bryan Chestnut on January 1, 2022***

## X. COMMENTS AND BASIS FOR OPINION

In forming my opinion, I have relied upon my training and experience in corrections, which include roles as an officer, instructor, and administrator. This expertise is further enhanced by training and information received from Mr. William Collins, Esq., an attorney and expert in correctional law.[1] Additionally, my opinions are informed by my ongoing studies and research into correctional management issues. These include regular reviews of case studies and correctional articles, as well as participation in correctional conferences and workshops. Such events are conducted by organizations including Americans for Effective Law Enforcement, the Institute for the Prevention of In-Custody Death, the American Jail Association, and the American Correctional Association, where I have participated both as a presenter and as an attendee.

My opinions are derived from the information I have reviewed and are a product of that review. They reflect relevant professional duties, standards of care, and accepted practices within the field of corrections. Should any additional information become available that impacts my opinions and conclusions, I reserve the right to modify my opinions and conclusions as necessary.

My reference to cases or use of any terms that have a specific legal definition is not intended to express any legal expertise. Rather, these references reflect the scope of my experiences and training as a correctional officer and correctional administrator. In operating a Constitutionally based correctional facility, a knowledgeable correctional administrator must rely on the legal precedents and cases determined by the Courts that guide our policy-making processes. These processes encompass the management and oversight of both secure correctional facilities and community-based correctional components, such as operating a day reporting center, providing adult probation services, and conducting court-ordered work-release programs.

Correctional administrators have the intended objective of implementing agency policies and practices that conform to Constitutionally based duties, applicable state regulatory standards, and standards of care and training. Supervision aims to ensure that correctional staff understand and apply those Constitutional duties effectively. Agency policy serves as a guideline, enacted through procedures that demonstrate generally accepted correctional practices grounded in Constitutional principles. The duties, standards of care, and accepted practices within corrections have evolved over time, reflecting "the evolving standards of decency that mark the progress of a maturing society."[2] It is the responsibility of the correctional administrator to stay informed of these changes and make adjustments to policies and practices to align with current legal and ethical standards, ensuring that the facility operates justly and humanely.

The phrase "generally acceptable correctional practice" refers to the standard methods and actions that correctional professionals follow or are expected to follow based on established legal policies that have been codified and adopted into policy and procedure. These are published, formally trained, and consistently supervised. The term "acceptable correctional practice" does not imply "best practice" or "ideal practice."

---

[1] Jail and Prison Legal Issues: An Administrator's Guide, William Collins, Esq., published by the American Jail Association, updated 2006 and The Supreme Court and Corrections: The Landmark Cases That Have Shaped America's Prisons and Jails, William Collins, Esq., published by the Civic Research Institute, 2019. Mr. Collins' books and presentation have provided legal insight to correctional administrators nationally.

[2] Quote taken from Supreme Court Chief Justice Earl Warren in *Trop v. Dulles*, 356 U.S. 86 (1958), "The (8th) Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."



EXHIBIT D

Rather, it encompasses the routine situations and scenarios that correctional personnel encounter as part of their daily responsibilities, which fall within a spectrum of reasonable options appropriate to any given correctional case.

These practices are formulated based on a framework of legal understanding, practical effectiveness, and ethical responsibility. They are designed to provide safe, secure, and fair environments within correctional facilities, reflecting the dynamic nature of law and society's evolving expectations and ethical norms. Correctional administrators must ensure these practices are well understood, consistently applied, and subject to continuous improvement, aligning them with the overarching legal mandates and societal standards of decency. Through regular training, evaluation, and oversight, correctional staff can navigate the complexities of their roles while adhering to practices deemed generally acceptable within the field.

While I am not a qualified medical practitioner, I have received emergency medical technician certification through the Lexington-Fayette Urban County Division of Fire and Emergency Services. My insights regarding medical care protocols and the timeliness of care services are framed from the perspective of a reasonable correctional administrator. In this role, it is crucial to ensure that both medical and custody staff adhere to established standards in providing care.

From such a viewpoint, a reasonable correctional administrator would focus on several key aspects:

- Adherence to Protocols: Medical protocols must be clearly outlined, updated regularly, and aligned with legal standards and medical best practices. They should be accessible to all relevant staff and integrated into the daily operations of the facility.
- Timeliness of Care: The provision of timely care is critical in a correctional environment to prevent medical conditions from worsening. Procedures should be in place to ensure quick response times and efficient escalation processes for medical issues.
- Collaboration Between Medical and Custody Staff: Effective communication and collaboration between medical staff and custody personnel are essential to manage healthcare needs and maintain security. This includes understanding each other's roles and responsibilities in providing patient care while ensuring safety within the facility.
- Training and Supervision: Regular training should be provided to educate staff on medical procedures, emergency responses, and changes in protocol. Continuous supervision and audits can help maintain a high standard of care and adherence to expected practices.
- Documentation and Accountability: Accurate documentation of medical interventions and incidents ensures transparency and accountability. This not only aids in ongoing care but also provides a record of the care provided.

Overall, reasonable correctional administrators are tasked with striking a balance between meeting the healthcare needs of the incarcerated population and maintaining the safety and security of the facility. The focus remains on ensuring that care services reflect a level of proficiency and efficiency expected within the guidelines of generally accepted correctional practices as expected by a reasonable correctional administrator.

In developing this rebuttal report, I relied on my training, experience, and knowledge as a

correctional administrator to evaluate the Expert Report provided by Dr. Richard Hough regarding the care and custody of Mr. James Bryan Chestnut while in the Okaloosa County Department of Corrections on January 1, 2022. My analysis focused on several key components of the report to assess the validity of Dr. Hough's findings:

1. Verification of Facts and Records: I conducted a review of all relevant documentation, including intake records, medical logs, staff logs, and incident reports to verify the factual assertions made in Dr. Hough's report.
2. Review of Standards and Protocols: It was important to compare Dr. Hough's evaluation against the established policies and protocols governing correctional health care and custody operations to identify any discrepancies or oversights.
3. Assessment of Compliance with Procedures: I assessed whether the staff interactions with Mr. Chestnut complied with the department's procedures and standards of care. This involved evaluating response times, medical assessments, and the care provided throughout his custody.
4. Evaluation of Expert Methodology: I analyzed the methodologies and criteria used by Dr. Hough in forming his opinions, checking for consistency with best practices in correctional health care evaluation.
5. Identification of Potential Bias: I considered whether any potential bias in Dr. Hough's conclusions might have affected his evaluation and ensured that my assessment remained objective.
6. Examination of Environmental and Resource Constraints: I examined how the facility environment and resource availability might have impacted the care provided and Dr. Hough's conclusions.
7. Critical Analysis of Conclusions and Recommendations: I analyzed the practical implications of Dr. Hough's conclusions and recommendations within the context of correctional facility operations to assess feasibility.

By evaluating these areas, my goal was to provide a thorough and objective rebuttal to Dr. Hough's expert report, ensuring that the analysis of Mr. Chestnut's care and custody was accurate and addressed any possible shortcomings identified in the initial evaluation.

## XI. ANALYSIS

### A. *Issues with Defense Expert's Dr. Richard Hough*

In examining the Defense's Expert Report authored by Dr. Richard Hough,[3] certain important pieces of information were missing, which may have affected the overall understanding of the issues. This rebuttal addresses these gaps by incorporating the missing data and contextual insights not considered by Dr. Hough. By presenting a more thorough evaluation, this rebuttal report seeks to highlight aspects that are crucial for an accurate assessment, ensuring that all relevant factors are considered. It is essential for the Court to have a complete and balanced perspective to make informed decisions based on all available evidence

Dr. Hough's report fails to include any reference to the statements provided by inmates Anthony McLeod and Anthony Roca to OCSO Investigator Kelly Henderson, regarding their observations of Mr. Chestnut's behavior, or lack of, while they were out on recreation in the F dayroom section of Charlie Unit on 01/01/2022. The observations provided by both Mr. McLeod and Mr. Roca in their statements captured on body camera video and transcribed contradict the statements made by Officers James Filpi and Clinton Colbert regarding the condition of Mr. Chestnut on 01/01/2022

Both Officer Colbert and Filpi recalled in their statements to OCSC Investigator Jeffrey Butler that they last observed Mr. Chestnut lying on his bunk in cell F3. Officer Colbert's observations were made from directly looking into the cell and while actively serving the evening meal, while Officer Filpi's observations were made from his position in the housing unit's control tower. Nevertheless, both Officers recalled Mr. Chesnut lying on his bunk and not observing any obvious signs or symptoms of distress. According to Investigator Butler's summary of Officer Colbert's statement:

> "Up until about 1600 hours, Colbert didn't recall seeing or interacting with the victim. At around 1600, Colbert did the afternoon feeding for the entire c pod. When he brought the food trays to the victim's cell, he recalled seeing the victim lying on the bottom bunk with his feet facing the cell door. Being it was not abnormal for inmates to sleep during the day, he left the food for the victim and continued his rounds
>
> Around 1705 hours, Colbert was notified by Filpi Fernandez had made a phone call in which he mentioned the victim being dead in the cell. Colbert immediately walked to the cell at which point Fernandez was in the shower and the victim was lying on his back on the floor with his feet facing the cell door. He entered and began tapping the victim's feet while trying to verbally gain his attention. When he got no response, Colbert check the victim for a pulse which he did not locate before notifying Filpi to call for a supervisor and medical to respond to his location. Prior to this, Colbert advised Fernandez never motioned him over or made any mention of the victim requiring assistance."[4]

And, from the transcript of Investigator Butler's interview of Officer Colbert:

---

[3] See Expert Report-Hough, Richard, Dr. dated 10/04/2024

[4] FIBRS Incident Report, Number OCSO22OFF000039-Barnhill, Wesley dated 01/01/2022; 2252 hours, p. 12



EXHIBIT D

"INVESTIGATOR BUTLER: Okay. **Do you ever recall at any point today seeing Chestnut and knowing for sure that he was alive or having any sort of interaction with him, seeing him up, walking, anything?**

**OFFICER COLBERT: I do not.**

**INVESTIGATOR BUTLER: You don't?**

**OFFICER COLBERT: No.**

INVESTIGATOR BUTLER: Okay.

OFFICER COLBERT: **Like I said, I was -- he was laying -- the last thing I remember was feeding him, you know. I didn't really -- he didn't talk today to me, so -- I don't recall him being up on the bars or anything.**

INVESTIGATOR BUTLER: Okay. What time did the -- did the call come in -- or, better yet, when the call came in, what was kind of your action? What do --

OFFICER COLBERT: The call came in at about 5:05 and I immediately walked down there. Fernandez was in the shower because he was out. I observed Chestnut laying on the floor. I checked his pulse -- I tried to get his attention, did the whole little tap and,"Hey, what --" he doesn't appear to be responsive and I don't see nothing moving.be responsive and I don't see nothing moving.

INVESTIGATOR BUTLER: Right.

OFFICER COLBERT: Checked for a pulse on his neck and immediately notified Filpi to call for a supervisor and medical respond."[5] (Emphasis added)

And,

"INVESTIGATOR BUTLER: Okay. **At 4:00 o'clock, when you delivered the feed, was he laying in bed** in that same --

OFFICER COLBERT: Direction?

INVESTIGATOR BUTLER: -- **direction**?

OFFICER COLBERT: **Yes.**"[6] (Emphasis added)

And,

"INVESTIGATOR BUTLER: And Fernandez, do you recall at any point while you were on the floor that second half, him ever motioning to you or trying to say,"Hey, something is going on with my bunkmate," or --

OFFICER COLBERT: Someone else was -- it was weird, it was nothing. I mean, all he did was -- I

---

[5] Transcript of Video Recordings Regarding James Chesnut (Deceased)-Colbert, Clinton (8/13-25; 9/1-16)

[6] Ibid (10/24-25; 11/1-4)



EXHIBIT D

remember Fernandez, I think -- **I believe he asked me when I was slinging trays, as we were feeding trays, if he could come out to take a shower. And that's when I told Filpi and Filpi was, like,"I'm going to 5 up after -- or 6 up after a minute and then we'll get him out.**

INVESTIGATOR BUTLER: Okay.

OFFICER COLBERT: But that was the only interaction and I -- I had it with, you know -- as far as him asking to come out or anything.

INVESTIGATOR BUTLER: Okay. **So at 4:00 o'clock, you're delivering the feed, he's laying in bed, and then around 5:00 o'clock the call comes in and you go down and find him on the floor?**

OFFICER COLBERT: Yeah.

INVESTIGATOR BUTLER: **Between 4:00 and 5:00 there was no –**

**OFFICER COLBERT: I was cleaning up, I used the rest room, I had to collect all the trays**

INVESTIGATOR BUTLER: And nothing --

OFFICER COLBERT: Blah, blah, blah. Yeah

INVESTIGATOR BUTLER: Okay

OFFICER COLBERT: So I really had nothing to do after that point, after slinging the tray till the time I went down there and found him. I was doing all of the other stuff in the pod."[7] (Emphasis added)

And,

INVESTIGATOR BUTLER: Did you have -- did you feed -- did you do the afternoon feeding?

OFFICER COLBERT: **I did the afternoon feeding.**

INVESTIGATOR BUTLER: Okay. So was that -- what time was that?

OFFICER COLBERT: **Approximately 4:00 o'clock.**

**INVESTIGATOR BUTLER: About 4:00. And you -- did you bring it to their cell?**

**OFFICER COLBERT: Hm-hmm.**

**INVESTIGATOR BUTLER: Who took the food?**

**OFFICER COLBERT: Fernando took his and Chestnut was laying on his bunk, so I just left it on the food flap, which isn't uncommon, because sometimes they wake up, sometimes they don't.**

INVESTIGATOR BUTLER: Okay. So did he just look like he was sleeping?

OFFICER COLBERT: He looked like he was asleep.

INVESTIGATOR BUTLER: What was he wearing at that point, do you remember?

---

[7] Ibid (12/14-25; 13/1-21)



EXHIBIT D

OFFICER COLBERT: I don't recall, to be honest. I just remember he was laying there and I was like, "I'm going to leave the tray."

INVESTIGATOR BUTLER: Did he say anything or —

OFFICER COLBERT: No.

INVESTIGATOR BUTLER: So no verbal interaction?=

OFFICER COLBERT: **No, but he hasn't been -- he's been weird the last two days, like mumbling, not coherent, just —**

INVESTIGATOR BUTLER: Yeah.OFFICER COLBERT: Just —

INVESTIGATOR BUTLER: Okay.

OFFICER COLBERT: You know."[8] (Emphasis added)

Officer Filpi's recollection of Mr. Chestnut's condition was similar to Officer Colbert's:

> "Filpi had no further interaction with the victim but **did recall looking into the cell during the 1600 hour feeding time at which point he noted the victim lying on the bottom bunk in the cell still wearing only his underwear.** He did not verbally interact with the victim at that time and made this observation from the tower being correctional officer Colbert was on the floor at the time and administering the food. **Not long after the 1600 hour feeding, the victim's cell mate Fernandez requested to make a phone call and was released from the cell via a release button from within the tower. Prior to that, neither Fernandez nor the victim had left their cell. In fact, the only inmates in that section of C pod who were permitted to leave their cell that day were the three males in cell 6.** Those males were out until until Fernandez requested to exit at which point they were brought back to their cell and Fernandez was released."[9] (Emphasis added)

And, from the transcript of Investigator Butler's interview of Officer Filpi:

"OFFICER FILPI: And so that section is for people that either are disciplinary problems, sometimes medical problems, sometimes – sometimes they're just shot out and they get housed into that. It's an administrative confinement section, for the most part.

**INVESTIGATOR BUTLER: Okay. And is -- are they kind of free to roam around throughout the day?**

**OFFICER FILPI: No, sir. No, sir.**

**INVESTIGATOR BUTLER: No?**

---

[8] Transcript of Video Recordings Regarding James Chesnut (Deceased)-Colbert, Clinton (4/10-25; 5/1-16)

[9] FIBRS Incident Report, Number OCSO22OFF000039-Barnhill, Wesley dated 01/01/2022; 2252 hours, p. 12

**OFFICER FILPI: The other inmates, their cells get rolled at 7:00 o'clock in the morning and they got locked down at 12:30.** In that section -- there are a few sections like that. In that section they're only rolled as we see fit. Like, for example, Cell 5 wasn't going to get out today because their poor behavior over the last couple of days.

INVESTIGATOR BUTLER: So when you say rolled, does that mean opened up and --

OFFICER FILPI: Yeah. Yes, sir.

INVESTIGATOR BUTLER: Okay.

OFFICER FILPI: I apologize.

INVESTIGATOR BUTLER: No, that's --

OFFICER FILPI: In the tower we have a panel that has all the cells and you can individually open them up --

INVESTIGATOR BUTLER: Okay.

OFFICER FILPI: -- so the people can get out. **Cell 6 was mostly medical fellas, and so they were pretty decent fellas. We let them out to get some phone calls and some showers,** and I told them -- and then Fernandez said that he wanted to get a phone call, and so I said you can get a phone call after we feed, because Fernandez is kind of squirrelly. I don't really want him out while I'm -- I don't want to turn my back on a gentleman like that. So I said you can go -- you can go get a phone call after we feed. **And those fellows went back up to 6. We secured them and let Fernandez out for a phone call, and I guess that's when he called his significant other**

INVESTIGATOR BUTLER: Did you -- now, when you let him out, so did he actually -- how did he interact with you guys to say I want to make a phone call? Was he just kind of --

OFFICER FILPI: I don't remember if he yelled it -- I don't remember if he yelled it through the window. He may have yelled it through the window as we were passing by.

INVESTIGATOR BUTLER: Okay. Did you, by any chance, look in at that point or did you see the deceased?

OFFICER FILPI: At that particular point? I believe -- I believe up till about 4:00 o'clock, that's the last time I remember looking looking in that cell. **At about 4:00 o'clock I remember the gentleman being on the bunk. I remember him being unclothed but I remember him being on the bunk about until we fed.**"[10] (Emphasis added)

And Officer Filpi's recall of when the inmates in F6 would have been out for recreation would have been before the evening meal service.

"INVESTIGATOR BUTLER: Okay. So the actual feeding to his cell was done by Officer Colbert?

OFFICER FILPI: Yes, sir.

---

[10] Transcript of Video Recordings Regarding James Chesnut (Deceased)-Filpi, James (8/1-25; 9/1-25; 10/11)

INVESTIGATOR BUTLER: Okay.

OFFICER FILPI: Yes, sir.

INVESTIGATOR BUTLER: But you --

OFFICER FILPI: At approximately 4:05.

INVESTIGATOR BUTLER: Okay. But you recall seeing the victim in there at 4:00 o'clock?

OFFICER FILPI: Yes, sir.

INVESTIGATOR BUTLER: And was that just – were you with him for the feeding or did you -- or is that when you let him out for the phone call? At what point did you --

OFFICER FILPI: **After Officer Colbert had left that section and moved on to -- I think he had already gotten finished with A Section, which would probably put it about 4:15, 4:20, I indicated for the fellas in F Section to go on up to their cells and they did. The guys from Cell 6, they went up there and then I opened the cell for Fernandez to come on out.**

INVESTIGATOR BUTLER: And that's when you – is that when you saw the victim?

OFFICER FILPI: **No, sir. I mean, I didn't notice him at that point.**

INVESTIGATOR BUTLER: So, I'm sorry, let me just make sure I get my question correct.

OFFICER FILPI: No problem.

INVESTIGATOR BUTLER: **When you say that the last time -- you recalled around 4:00 o'clock that you saw him in the bunk, that he was --**

**OFFICER FILPI: Hm-hmm.**

**INVESTIGATOR BUTLER: -- he wasn't wearing -- so at what point was that interaction where you saw him? Was that --**

**OFFICER FILPI: That was when Colbert was feeding him.**

INVESTIGATOR BUTLER: Okay. Okay.

OFFICER FILPI: The last I had seen -- I had seen him all through the afternoon, from noon -- from noon to about 4:00 o'clock I noticed him laying in bed, he didn't move, he didn't -- he didn't, like, talk to anybody."[11]

Officer Filpi's Interrogatory responses appear to contradict the statements made to Investigator Butler. According to his Interrogatory, Officer Colbert denied hearing Mr. Chestnut "mumbling, not coherent."

The Officers' recall of Mr. Chestnut lying in the bunk through the conduct of the evening meal differs significantly from the recall of the inmates from cell F6, who were permitted out into the pod's common area for showers and recreation in the hours prior to meal service by Officer Colbert. According to inmates Anthony McLeod, Anthony Roca and Chance Mayberry, they observed Mr. Chestnut lying on the floor of cell F3

[11] Ibid (12/20-25; 13/1-25; 14/1-13)



EXHIBIT D

in essentially the same position as he was found after the Chief had received a text message informing him that there was a dead inmate in Charlie Unit, cell F3, as seen in Photos 1 & 2.

> "Filpi remained in the tower until he received a call from Sgt Mercino telling him somebody had just sent a text message to the Chief of the jail and told him they received a call from Fernandez who told them the victim was dead. Filpi relayed the information to Colbert who then entered the cell where he found the victim. Filpi remained in the tower until medical personnel were on scene at which point he walked down but did not enter the cell or assist in life saving efforts."[12]




Photo 1-View of F3 and Mr. Chestnut from sub-dayroom area.




Photo 2-View of F3 and Mr. Chestnut from cell door entrance.

Mr. Joe Fernandez, who was Mr. Chestnut's cellmate, reportedly made a telephone call after being released from cell F3 for recreation following the meal service. The officers indicated that this was their first sign that Mr. Chestnut might be in medical distress. However, inmates from cell F6 offer a very different account of the events leading up to Officer Colbert discovering Mr. Chestnut deceased on the floor of cell F3. Dr. Hough's report does not mention the information provided by the three inmates from cell F6 to the OCSC investigators on the day of Mr. Chestnut's death, despite this information being included in the investigative report.

Inmates Mr. McLeod, Mr. Mayberry, and Mr. Roca reported that they saw Mr. Chestnut lying on the floor of his cell before the meal services, as shown in Photos 1 and 2. Mr. McLeod even tried to wake Mr. Chestnut by throwing water on him, but was unsuccessful. Additionally, Mr. Roca stated that he informed Officer Colbert about his concerns for Mr. Chestnut, and Mr. Roca asserts that Officer Colbert acknowledged these concerns. However, none of this information is mentioned in Dr. Hough's report.

---

[12] FIBRS Incident Report, Number OCSO22OFF000039-Barnhill, Wesley dated 01/01/2022; 2252 hours, p. 12

In the investigative report's synopsis of Mr. Anthony McLeod's statement, Mr. McLeod highlighted concerning behavior by Officer Colbert, which was notably absent from Dr. Hough's report. Mr. McLeod, Mr. Chestnut's cousin by marriage, recounted the events of 01/01/2022, when officers, including Officer Colbert, let him and his cellmates out around 3:00 PM. Mr. McLeod observed his cousin, Mr. Chestnut, lying unresponsive on the cell floor.

After being informed by Mr. Chestnut's cellmate that he couldn't move, Mr. McLeod attempted to communicate with Mr. Chestnut and even threw water on Mr. Chestnut to rouse him, but received no response. Despite Mr. McLeod and other inmates rom F6 noticing Mr. Chestnut's distress and the potential urgency of the situation, Mr. McLeod described that officers, including Officer Colbert, repeatedly walked past F3 without taking any action. This inaction was not reflected in Dr. Hough's report, which omitted mention of these critical observations and behaviors, raising concerns about the thoroughness and accuracy of his documented findings.

> "Anthony McLeod, in a sworn verbal statement, stated the officers let him and his roommates out of their cell on January 1, 2022, at approximately 1500 hours. **McLeod further stated he observed his cousin/victim, James Chestnut, laying on the floor of his cell.** According to McLeod, Chestnut's"bunkie" told him Chestnut was unable to move. **McLeod said he attempted to talk to Chestnut, several times, however Chestnut never responded to him. McLeod stated he took a shower and when he finished, he threw a"handful of water" on Chestnut however, Chestnut did not move nor did he say anything.** While speaking with Anthony McLeod, I asked him if he was aware if Chestnut suffered from any medical issues. McLeod stated"no" but he is a"heroin junkie." McLeod further explained he was assigned to this pod earlier in the day on January 1, 2022, and when he walked past Chestnut's cell, he observed Chestnut sitting on his bunk"rocking back and fourth." McLeod spoke to Chestnut but Chestnut did not respond to him. McLeod said he asked Chestnut's"bunkie" what happened and his"bunkie" responded by saying"he just fell backwards." **McLeod also stated officers walked around the pod several times, while Chestnut was laying on the ground, but never did anything.**"[13] (Emphasis added)

And, from Mr. McLeod's transcribed statement taken on 01/01/2022:

"INVESTIGATOR HENDERSON: Did you happen to see or hear --

INMATE ANTHONY 1: I did. I did. About -- **they let us out about 3 -- about -- I'll say anywhere between 3:15, 3:20, let us out**

INVESTIGATOR HENDERSON: Uh-huh.

INMATE ANTHONY 1: Bryan is my cousin

INVESTIGATOR HENDERSON: Okay.

INMATE ANTHONY 1: **So I walked in there trying to talk to him and he's laying in the floor**

[13] FIBRS Incident Report, Number OCSO22OFF000039-Barnhill, Wesley dated 01/01/2022; 2252 hours, p. 15

**unresponsive. I asked his bunkie, can he move, and the bunkie said no. So I took a shower, you know what I'm saying. I figured Bryan laying there, I come out and tried to talk to him again and he wouldn't talk, so I went out, started to put my stuff up. Then I come back, got a handful of water out of the shower and threw on him. He still didn't move**

INVESTIGATOR HENDERSON: Was he laying --

INMATE ANTHONY 1: Yes

INVESTIGATOR HENDERSON: **How was he laying on the floor?**

**INMATE ANTHONY 1: One like this —**

**INVESTIGATOR HENDERSON: On his back?**

INMATE ANTHONY 1: One hand -- yes

INVESTIGATOR HENDERSON: Okay. And you think that was around 3:00 or 3:20?

INMATE ANTHONY 1: Yeah, somewhere around there

INVESTIGATOR HENDERSON: It was before dinner?

INMATE ANTHONY 1: Yes."[14] (Emphasis added)

And, from the report synopsis of Mr. Roca's statement:

"After speaking with Anthony McLeod, I then made contact with Anthony Roca. On the date in question, sometime during the morning hours, Roca observed the victim laying on his bunk. Roca said the victim was"stiff as a board and started making noise" as if he was in pain. Roca and his two (2) bunkmates were allowed to walk around in the pod. While walking/moving around in the pod, Roca observed the victim laying on the floor of his cell. Roca believes this was just before 1500 hours. **Roca described the victim as laying on his back and not saying anything. Roca remembers hearing one of the officer's saying they need to check on the victim when they get done with"chow."** I asked Roca if he recalls hearing any yelling and/or arguing from the victim's cell and he said no."[15] (Emphasis added)

And, from Mr. Roca's transcribed statement taken on 01/01/2022:

"INMATE ANTHONY 2:. **And then today when we got out of the cell, it was right a little before 3:00, all three of us got out, and he was laying on the ground the whole time, and that one officer that was floating actually came in.**

INVESTIGATOR HENDERSON: Yeah.

---

[14] Transcript of Video Recordings Regarding James Chesnut (Deceased)-McLeod, Anthony (Anthony 1), Roca, Anthony (Anthony 2) and Mayberry, Chance (2/20-25; 3/1-25)

[15] Ibid, p. 15

INMATE ANTHONY 2: **And he looked over there at him and he said, "After we get done with chow, we need to check on him." They should have stopped and checked on him, is what they done, but nobody did,** and his roommate was up top on the bunk and he said something. He's like,"I'd just like to get out and take a shower and if y'all could let me out to make a phone call." And he's like,"Okay. Well, if you could, you know, make sure he's doing all right," because -- he made a joke. He said,"I'm real worried about him running out of the cell," or something like that. I don't think they really paid -- thought he was --

INVESTIGATOR HENDERSON: Yeah.

INMATE ANTHONY 2: You know.

INVESTIGATOR HENDERSON: Yeah.

INMATE ANTHONY 2: So that was pretty much what I know."[16] (Emphasis added)

And, from the report synopsis of Mr. Mayberry's transcribed statement taken on 01/01/2022:

"After speaking with Anthony Roca, I then made contact with Chance Mayberry. Chance Mayberry, in a sworn verbal statement, stated on January 1, 2022, at approximately 1530 hours, he was walking around the pod when he heard the victim talking to his cell mate. **Mayberry said the victim was laying on his back on the floor of the cell the entire hour he (Mayberry) was walking/ moving around the pod.**"[17] (Emphasis added)

And, from Mr. Mayberry's statement:

INVESTIGATOR HENDERSON: Yeah. Can you tell me what you saw or heard today, if anything?

INMATE CHANCE: Well, we was -- I was walking around in circles and I seen him laying on the floor, but he was talking to the roommate of his.

INVESTIGATOR HENDERSON: Okay

INMATE CHANCE: Because --

INVESTIGATOR HENDERSON: What time do you think that was?

INMATE CHANCE: It was like -- we got out at 3:00, so probably 3:30.

INVESTIGATOR HENDERSON: Okay

INMATE CHANCE: And his roommate said,"Hey, are you okay?" And the old man said,"Yeah, I'm fine. Just stretching out."

INVESTIGATOR HENDERSON: Hm-hmm

---

[16] Transcript of Video Recordings Regarding James Chesnut (Deceased)-McLeod, Anthony (Anthony 1), Roca, Anthony (Anthony 2) and Mayberry, Chance (11/8-25; 12/1-6)

[17] Ibid, p. 16

INMATE CHANCE: So I thought he might be kind of cold on the floor.

INVESTIGATOR HENDERSON: Yeah.

NMATE CHANCE: Laying there.

INVESTIGATOR HENDERSON: How long do you -- were you guys out?

INMATE CHANCE: An hour.

INVESTIGATOR HENDERSON: Was he -- did you ever see him move at all during that hour or did he stay on the floor?

INMATE CHANCE: He stayed -- he stayed on the floor.

INVESTIGATOR HENDERSON: Was he on his stomach, back, side?

INMATE CHANCE: His back.

INVESTIGATOR HENDERSON: On his back?

INMATE CHANCE: Hm-hmm."[18] P14 , 15 & 16

Mr. McLeod recalled that during a conversation with Officer Colbert, Officer Colbert appeared to be aware that Mr. Chestnut was showing signs of distress. Under typical circumstances, a reasonable correctional officer would promptly check on Mr. Chestnut's welfare after noticing such signs. At the time of this conversation, Officer Colbert was in the F section sub-dayroom, feeding inmates in cells located directly above Mr. Chestnut's cell. Given this proximity, it would be expected that Officer Colbert would check on Mr. Chestnut's condition before leaving the sub-dayroom. However, Officer Colbert continued with the meal process for the entire Charlie Unit, including the collection of empty trays, without checking on him. Officer Colbert only did so after Officer Filpi, responding to a supervisor's call, directed him to check on Mr. Chestnut. Again, there is no mention of Mr. McLeod's statements in Dr. Hough's report.

Following Officer Colbert's and Officer Filpi's call for a medical emergency, their supervisor, Sergeant Romke Mersino, arrived at F3 and found Mr. Chestnut cold to the touch. This observation was confirmed by both the responding nurse, RN Jessica White, and the emergency medical technician, Lieutenant Brian Welch.

"Upon getting the call for help, Sgt Mersino entered the pod about the same time as Sgt McNaulty. He entered the victim's cell where he found the victim lying on his back unresponsive. Mersino rolled the victim toward his side to the recovery position at which time he noted him to be stiff and cold."[19]

"On January 1, 2022, White was working when she was notified via radio of a need for medical assistance in C-pod. Upon arrival, she entered the victim's cell along with LPN Tanya Stoute and attached an AED which gave no indication to shock. She also administered a single dose of

[18] Transcript of Video Recordings Regarding James Chesnut (Deceased)-McLeod, Anthony (Anthony 1), Roca, Anthony (Anthony 2) and Mayberry, Chance (14/22-25; 15/1-25; 16/1-4)

[19] FIBRS Incident Report, Number OCSO22OFF000039-Barnhill, Wesley dated 01/01/2022; 2252 hours, p. 13



EXHIBIT D

NARCAN in case the victim was suffering from an opiate related overdose however she received no reaction. According to White, the victim was already cold to the touch and had no pulse at the time of her arrival."[20]

"On 1/1/21 I responded to a call for service reference an Agency Assist/Suspicious Death at the Okaloosa County Jail. Upon arrival I made contact with Lt. Welch of EMS. Welch advised that he arrived to the cell of the victim, later identified as James Chesnut, at approximately 1705 hours. Chesnut was cold to the touch and laying on the cell floor."[21]

Again, there is no mention in Dr. Hough's report of any of the information provided by the inmates or the fact that responders noted Mr. Chestnut was cold to the touch. In fact, Dr. Hough states in his report:

"I reviewed nothing in the record indicating that the named Defendant officers either contributed to, or exacerbated, James Chestnut's health deterioration through the conduct of their duties as security officers. Officers did not note any rapid decline in Mr. Chestnut's physical condition."[22]

Yet, contrary to Dr. Hough's statement, in reviewing the available records, which he had access to and reviewed as indicated in his report, there is some evidence indicating that Officers Colbert and Filpi may have overlooked or failed to document and respond to a rapid decline in Mr. Chestnut's physical condition that was brought to the attention of Officer Colbert by inmate Mr. Roca.

A private investigator, engaged by the Plaintiff's attorney, conducted interviews with Mr. Roca and Mr. McLeod concerning the incidents involving Mr. Chestnut on 01/01/2022. It is important to note that Dr. Hough did not have access to the information obtained in these interviews, relying solely on data from the OCSO investigations, as documented in the FIBRS report and the associated transcripts. Despite the interviews occurring several years post-incident, both Mr. McLeod and Mr. Roca retained a clear recollection of the events of 01/01/2022.

The accounts given by Mr. McLeod and Mr. Roca were consistent with the statements they provided to OCSO Investigators on the day of the incident, sometimes offering even greater detail. Importantly, neither individual deviated from their earlier testimony. Mr. McLeod specifically recounted multiple attempts to alert staff to Mr. Chestnut's apparent signs and symptoms of distress. This included an issue with a missing wheelchair and observing Mr. Chestnut lying on his cell floor while Mr. McLeod was outside his cell for recreation.

"Okay. Do you remember an incident where a inmate, Chestnut passed away while you were there?

Yes, ma'am.

Tell me what you remember about that incident.

---

[20] Ibid, p. 11

[21] Ibid, p. 10

[22] p. 23, Number 13.

I come in the day before I got sick in my in my dorm, and they put me in medical and the next day they put me in there. Bryan was sitting up, and I tried talking to him cause we're cousins. He wouldn't. He wouldn't respond to me. He was rocking. So the next day, he asked me, could I hit the button and tell him that he needed this wheelchair? So I hit the button, and Officer up there told me, No, don't worry about it. Go lock down. So I went and locked down. The next day, **they let me out to take a shower. So I went by and Bryan was laying on the floor. So I took a shower. I mean, I tried talking to him, I took a shower and come back, and he still wouldn't respond. So I went and got a handful of water, and I threw it on him, and he didn't move. And asked his bunky, how long you been laying there? He said, he just fell back. You've been laying there. So I went and hit the button again to talk to whatever officer I forget his name was on on duty, and he told me not to worry, worry about it. To go, go, lock down.** Then it was about four or five hours, before they feed chow. **And Bryan was still laying on the floor, and they passed out the trays, and I noticed for myself that Bryan didn't get his tray, didn't move, and then right before shift change, they were coming there, check on him. I mean, officer even took the tray, and Bryan's still laying on the floor, and also took the tray.** And right before shift change, he got worried about it coming there, checking on him. But Bryan been dead four or five hours."[23] (Emphasis added)

And,

"Did you ever have a discussion with Bryan Chestnut's roommate?

Yes, yea.

Hernandez or whatever?

Yeah. **But I went and took a shower, come out. I talked to him. You know, it's how long Bryan been laying there. He said, he just said, Bryan would just fell, and been laying there, and ain't moved. Think something wrong with him. That's when I hit the button. I believe it. Look, head, look, look, whatever officer was on. I hit the button. He told me not to worry about it. Go, go, lock down.**"[24] (Emphasis added)

And from the private investigator's interview of Mr. Roca:

"Okay, so can you tell me what you remember about all of that?

Okay, what I remember is I went to MHU. First it was in. I was in like a closed housing, okay, and then they transferred us into the MHU overflow. This is before they had the cameras in the jail. Okay? Bryan Chestnut was on the bottom tier floor, okay, and he was, they kept seeking assistance. We were on that 23 hour lockdown thing, okay, because it was still kind of COVID time, and I can't remember, I think another one was another guy was his name was Anthony, but I can't remember his last name. He made a statement too. Anyways, that Bryan, who come to the bars before he got

---

[23] Plaintiff's Investigator Interviews-McLeod, Anthony dated 11/29/20

[24] Ibid



EXHIBIT D

bad off and was asking for help. **They took his wheelchair away, okay, and the officer that was working was Officer Hopkins. He was in the tower, but there was a, there was a floor officer, and I think Officer Hopkins still works there, and they told us, don't, don't tell us how to do our job. Basically, I said, well, the man's asking for medical assistance. And then the next day went by, he was laying on the floor, and then he wasn't responsive, and he didn't and the only thing I remember is we, you know, the officer, saw him laying there, and they never did come and check on him. And then when they finally did come and check on him, he was dead.**"[25]

And,

"Okay, I'm going to read you what the report said they that they the report, that statement that you gave, just let me know if it's accurate. Okay, on the date, on a date in question, sometime during the morning, Anthony Roca observed the victim laying on his bunk. Roca said the victim was stiff as a board and started making noise as if he was in pain. **Roca and his two bunk mates were allowed to walk around in the pod while walking around in the pod, Roca observed the victim laying on the floor of his cell. Roca believes this was just before 1500 hours. Roca described the victim as laying on his back and not saying anything. Roca remembers hearing one of the officers saying they need to check on the victim when they get done with chow.** I asked Roca if he recalls hearing any yelling and any yelling and or arguing from the victim cell, and he said no. After speaking with Anthony Roca, I made contact with the chance maybe or, okay, so does that sound accurate?

It's not really, but the part of him land on the floor, yes, because he went from his bunk and he wasn't moving, he wasn't eating. Okay, that I remember, but now I'm up on the top here. So they were passing out meals. So I don't know if he ate or not. I wasn't in the cell with him, **but when I went back the next time they let me out and I went to go take my shower and use my time on the phone, he was laying on the floor and his boxers, just laying on the cold floor in his boxers. And he stayed that way until they, till they come and seen him. That's, that's what I remember so, and I do remember the officer saying, quit asking for help. We're going to get to it when we get to it.** That, that part is correct."[26]

The testimony of Officers Colbert and Filpi regarding Mr. Chestnut's condition on the afternoon of 01/01/2022, substantially diverges from that of the inmates in the housing unit, Mr. McLeod and Mr. Roca. Despite this significant discrepancy, Dr. Hough's report fails to address this variance, irrespective of the inclusion of the private investigator's interview.

---

[25] Plaintiff's Investigator Interviews-Roca, Anthony dated 12/12/2023; 0912 hours

[26] Ibid



EXHIBIT D

***Some Additional Observations Concerning Dr. Hough's Report***

Dr. Hough's lengthy argument citing statistics regarding inmate mortality in jails seems to be committing the fallacy of "sweeping generalization." This logical fallacy occurs when someone applies a general rule to a specific case without considering exceptions that might make the rule inapplicable. In essence, relying solely on generalizations can overlook significant details that change the situation. Officers observing an individual exhibiting obvious signs and symptoms of distress cannot ignore those signs and symptoms of distress simply because of the statistical generality that it is difficult to provide medical care in jails and prisons. The officers have a duty to act as correctional administrators have been instructed by cases like *Estelle v. Gamble*[27]and *Farmer v. Brennen.*[28]

Applied to this case, Dr. Hough relies on general statements about jail inmates' health and mortality nationally using Bureau of Justice Statistics (BJS) data. However, he fails to directly address whether these generalizations are applicable to Mr. Chestnut's health and the circumstances of his death on January 1, 2022. If Mr. Roca, Mr. McLeod and Mr. Mayberry are to be believed, then Mr. Chestnut spent considerable time lying on the floor of his cell in clear view of Officer Colbert (especially when serving the evening meal to Mr. Chestnut and Mr. Fernandez) and Officer Filpi in the tower. Consider that Mr. Fernandez had to move the styrofoam tray from the food port before the F3 cell door could be opened providing him access to the shower, recreation and the opportunity to make the telephone call resulting in the text message to the Chief.

Dr. Hough also seems to rely on a strict distinction between mental and physical health, as if mental health distress need not be treated as a physical health distress. But we know this is false: all sorts of physical ailments can cause one to behave in psychologically odd ways. Brain tumors, urinary tract infections, strokes, chemical imbalances (including drug and alcohol withdrawal) are all physical ailments that also present psychological abnormalities. Note that Dr. Hough states in his report:

> "The corrections officers did not note any physical decline in Mr. Chestnut. In fact, we know that Mr. Chestnut was already receiving medical care for a knee injury jumping down from his bunk. Medical staff saw Mr. Chestnut on the 29th and then on the 30th for an x-ray and subsequent prescription for Motrin. These professional medical staff did not notice a rapid decline either, making it even less likely that security staff would have been aware of such. While two officers noted that Mr. Chestnut made statements that seemed unclear, he "...never made any complaints or appeared to need any assistance." As noted below, given the significant numbers of incarcerated individuals experiencing diagnosed and undiagnosed mental health challenges, statements seen as unusual are not unexpected."[29]

And

"I reviewed nothing in the record indicating that the named Defendant officers either contributed to,

---

[27] *Estelle v. Gamble*, 429 U.S. 97; 97 S. Ct. 285; 50 L. Ed. 2d 251; 1976 U.S. LEXIS 175, (1976)

[28] *Farmer v Brennan*, (92-7247), 511 U.S. 825 (1994)

[29] Expert Report-Hough, Richard, Dr. dated 10/04/2024, p. 15

or exacerbated, James Chestnut's health deterioration through the conduct of their duties as security officers. Officers did not note any rapid decline in Mr. Chestnut's physical condition.Officers did not note any rapid decline in Mr. Chestnut's physical condition."[30]

The behavior of Officer Colbert in the face of Mr. Chestnut's deteriorating condition is undeniable and was not addressed by Dr. Hough. Mr. McLeod's statement highlights that, despite witnessing Mr. Chestnut lying unresponsive and his previously recognized transformation from clarity to incoherence—speaking nonsensical "jibberish"—Officer Colbert, along with Officer filpi, ignored these alarming signs. Testimonies from both Officer Colbert and Officer Filpi corroborate Mr. Chestnut's precipitous mental decline, yet they failed to act appropriately when Mr. Chesnut was observed lying on the floor of his cell, unresponsive to both Mr. McLeod's and Officer Colbert's attempts to garner a response. The Dr. Hough's report conspicuously omits this critical lapse, undermining the integrity of his findings.

"INVESTIGATOR BUTLER: What would have been your interactions with the victim or the deceased?

OFFICER FILPI: The deceased? Mr. Chestnut, over the last two days, I've made contact with him about five or six times. He rambled off a fairly incoherent -- I mean, they were words but they didn't seem to have any rhyme or reason why he was saying them. I went in there with medical a couple times. She attempted to give him medication. I'll be honest with you, I don't remember if he received the medication or took it or not, but he was not really in a conversation at any point with anybody that I saw. There was no -- **he didn't have the coherency to his speech to have a back-and-forth with you.**"[31] (Emphasis added)

And, from Officer Colbert:

INVESTIGATOR BUTLER: Okay. Any -- since the deceased has been in, any sort of issues with him complaining or making threats of, you know, wanting to harm himself or —

OFFICER COLBERT: No.

INVESTIGATOR BUTLER: Nothing at all?

OFFICER COLBERT: He's not really been making any sense for the two days. We started our shift Friday, Saturday, Sunday.

INVESTIGATOR BUTLER: Okay.

OFFICER COLBERT: It was our three-day. Really, the few little things I have seen over yesterday and, you know, obviously not much this -- today —

INVESTIGATOR BUTLER: Right.

OFFICER COLBERT: -- was just mainly based on yesterday, was he was kind of jibberish.

---

[30] Ibid, Number 13, p. 23

[31] Transcript of Video Recordings Regarding James Chesnut (Deceased)-Filpi, James (3/24-25; 4/1-13)



EXHIBIT D

INVESTIGATOR BUTLER: Okay.

OFFICER COLBERT: You know, just not -- didn't really make sense. Didn't ask for nothing, didn't want no —

INVESTIGATOR BUTLER: Just kind of mumbled on?

OFFICER COLBERT: "Okay, man," you know, just —=

INVESTIGATOR BUTLER: Right.

OFFICER COLBERT: "Don't know what you're talking about but.."[32]

Interestingly, both Officer Colbert's, and Officer Filpi's, Interrogatory responses appear to contradict the statements they made to Investigator Butler. According to his Interrogatory, Officer Colbert denied hearing Mr. Chestnut "mumbling, not coherent."

From Officer Colbert:

"Between the dates of December 25, 2021 and January 1, 2022, did you observe Mr. Chestnut having difficulty speaking in any way or demonstrating any confusion, disorientation, or cognitive impairment of any kind? If your answer is 'yes," please describe what you observed; where and when you observed it; and identify any person(s) who were with you at the time.

ANSWER: No."[33]

From Officer Filpi:

"Between the dates of December 25, 2021 and January 1, 2022, did you observe Mr. Chestnut having difficulty speaking in any way or demonstrating any confusion, disorientation, or cognitive impairment of any kind? If your answer is 'yes," please describe what you observed; where and when you observed it; and identify any person(s) who were with you at the time.

ANSWER: I did not observe Mr. Chestnut having any difficulty speaking, nor did I notice any confusion, disorientation, or cognitive impairment."[34]

Given the above statements, for Dr. Hough to say that the officers did not note any "physical decline" while they clearly noted a mental abnormalities, lacks veracity.

A reasonable correctional administrator requires officers to report if they see an inmate in physical distress. So when Officer Colbert and Officer Filpi observed Mr. Chestnut speaking in a way that did not make any sense, nor moving around his cell as one typically sees inmates do during the daylight hours, a reasonable correctional officer would have taken these as signs of possible physical distress and not simply blow it off as

[32] Transcript of Video Recordings Regarding James Chesnut (Deceased)-Colbert, Clinton (6/7-25; 7/1-8)

[33] Defendant, Clinton Colbert's Response to Plaintiff First Set of Interrogatories to Defendant dated 10/26/2024, Number 10, p. 4

[34] Defendant, James Filpi's Response to Plaintiff First Set of Interrogatories to Defendant dated 10/26/2024, Number 10, p. 4

a "mental event." Added to this is the information brought to them by the inmates from cell F6, if accurate, then how did they know that this was not some kind of stroke or withdrawal symptom, and not just a mental event? I would agree that these are difficult situations for officers to discern, hence as correctional administrators we establish policies and procedures for reporting such events to medical, mental health and supervisory staff.

If both Officer Colbert and Filpi. noted that Mr. Chestnut was in distress, even the significant behavioral change they describe, and took no action, then Dr. Hough's broad statistical generalizations are inadequate to assess the specific responsibilities and failures that may have occurred in his case. Even if most inmates' health concerns follow certain statistics, that does not mean jail staff can ignore an inmate's visible and specific health crisis, i.e., Mr. Chestnut's significant change in behavior from apparent rational to speaking "gibberish," a behavioral change both Officer Colbert and Officer Filpi observed and noted.

One final issue not covered in Dr. Hough's report is the absence of Mr. Chestnut's wheelchair. Medical records indicate that medical staff ordered a wheelchair for Mr. Chestnut to use for one week, with the notation:

> "MEDICAL SUPPLIES/SPECIAL EQUIPMENT: WHEELCHAIR UNTIL: 01/01/2022; WHEELCHAIR X 1 WEEK."[35]

Despite this, photographs and video taken by OCSO Investigators show no wheelchair in his cell, or the Charlie housing unit.[36] There are no records that medical rescinded this order prior to Mr. Chestnut's death on 01/01/2022 which would explain why he did not have the wheelchair in his cell. Instead, it appears that the custody staff were storing Mr. Chestnut's wheelchair outside the Charlie housing unit under the stairs leading to the pod area control room.[37] (See Photo 3)


Photo 3-Wheelchair stored under steps outside Charlie housing unit.

A reasonable correctional administrator would have expected the medical issuance of a wheelchair to help Mr. Chestnut move within his cell (e.g.,

[35] See Condensed Health Services Encounters dated 12/29/2021; 1343 hours (Sick Call-Knee Pain)-White, Jessica RN

[36] See Cell Search, Charlie Unit, Cell F3 dated 01/02/2022 from 03:28:58 to 03:33:12 (Butler, J.) and Charlie Unit, Cell F3 dated 01/02/2022 from 00:11:44 to 00:12:38 (Blake, M.)

[37] Cell Search, Charlie Unit, Cell F3 dated 01/02/2022 from 03:28:58 to 03:33:12 (Butler, J.) at 03:30:49



EXHIBIT D

to the toilet) and during his release for showering and recreation. In this position, Mr. Chestnut would have to request the wheelchair, and then wait for an officer to bring it to him, even if it just to facilitate movement to the toilet in the cell. According to Mr. McLeod and Mr. Roco, Mr. Chestnut repeatedly requested a wheelchair in the days leading up to his death on 01/01/2022 without it being provided. Again, there is no mention in Dr. Hough's expert report about this issue.

In conclusion, while broad patterns can guide general policies, they should not be used to dismiss individual cases where specific observations and interventions are warranted. Sweeping generalizations risk erasing vital practical obligations in these situations, resulting in neglect of duty and potentially severe consequences, such as seems to have occurred with Mr. Chestnut.

## XII. REPORT CONCLUSION

Dr. Richard Hough presents an excellent treatise on the issues involving the provision of medical care to inmates in local county jails. Nevertheless, Dr. Hough failed to consider critical pieces of information regarding the care and custody of Mr. James Bryan Chestnut while in the Okaloosa County Jail on January 1, 2022, that would indicate Officers Colbert and Filpi failed to respond to Mr. Chestnut's need for medical care.

**I reserve the right to supplement or alter my opinion should additional information be received**

Donald L. Leach II

November 18, 2024



EXHIBIT D

# Donald L. Leach II

2130 East Wasatch Boulevard, Sandy, Utah 84092
donald.leach@me.com
(859) 552-4286


## Summary of Qualifications

Experience for over 30 years in local detention (jails)/corrections.

Experience for over 20 years consulting on jail management issues nationally focusing on risk management for jails and jail operational methodology.

Experience for over 8 years as an Expert Witness in both Federal and State courts.

Supervisory experience of up to 402 employees (indirectly); supervised internal affairs investigations, experienced in interviewing, hiring, training, scheduling, motivating, evaluating, and dismissing personnel.

Experienced in administering and managing a large detention facility, developing and administering programs, budgeting, contract development and monitoring, conducting research, monitoring compliance with policies and procedures, community relations, public speaking, controlling costs, problem-solving, and preparing reports.

Extensive public relations experience as Public Information Officer for the Division developing press releases and conducting print and broadcast interviews.

Excellent oral and written communication skills in relating with people from a broad range of backgrounds.

Extensive computer experience, including planning, developing, maintaining, and installing networks.

## Employment History

***Consultant*** – 1993 to Present *Donald L. Leach & Associates, Ltd.*

Sandy, Utah

Responsible for providing a range of consultative and expert witness services involving overall jail management; including, but not limited to, such areas use of force relating to issues of security and operations, the provisions of medical and mental health services, classification, contract management for privatized services (food, medical, mental health), management information systems, strip search, gang and security threat group management in jails. Co-created and developed a new jail management paradigm – Mission Based Management. Activities include conducting training seminars in developing and implementing jail classification systems, risk management methodologies; conducting on-site visits to client facilities to evaluate jail management systems and classification systems, conduct risk management analysis; analyzing data and information systems; and developing and enhancing jail classification programs. Clients have included the Department of Justice; Ministry of Justice, The Netherlands; National Institute of Corrections; American Jail Association; Voorhis-Robertson Justice Services; and Sabbatine and Associates, LLC., among others.

***Administrative Officer, Senior (Deputy Director)*** – 1996 to 2008 *Lexington-Fayette Urban County Division of Community Corrections*

Lexington, Kentucky

Responsible for providing the Director of Community Corrections with expert advice and a full range of staff, analytical, planning, and support services related to the management and operation of the Division of Community Corrections, which provides care and custody services to over 1000 adult and 60 juvenile



EXHIBIT D

offenders within a modern detention framework. Serve as Director in his absence. Responsible for assisting Director in analyzing and resolving Divisional administrative and management problems; supervising internal affairs investigations; contract development and management of privatized services (medical, mental health, food services, commissary, technology and energy); supervising subordinates; handling administrative and management duties regarding the planning, organizing, implementing, and supervising of projects and special events; administering and implementing community development programs; attending staff meetings; preparing oral and written reports; conducting research and special studies; composing newsletter articles and promotional materials; developing and formulating policies and procedures; and serving as a liaison between the Division of Community Corrections, the public, and other governmental organizations. Served as a primary member of management team responsible for the construction of a new $62 million jail facility which including spearheading the new facility transition team. Conceived, designed, implemented and managed of a $2.5 million voice, video, and data network to support the new facility. Conducted Community Corrections Officer duties as needed and when implementing newly developed policies.

***Planning / Research Analyst*** **–** 1992 to 1996 *Lexington-Fayette Urban County Division of Detention*
Lexington, Kentucky
Responsible for providing the Director of Community Corrections with expert advice, as well as a full range of staff, analytical, planning, and support services related to the management and operation of the Division of Community Corrections; developing, implementing, maintaining, supervising, and serving as system administrator for the WAN / LAN automated inmate management information system, including hardware and software; developing and enhancing the Urban County Criminal Justice Network; performing research and analysis of public policy issues for use by members of the Urban County Council; analyzing existing programs and operations and summarizing findings with recommendations; serving on various committees; overseeing various projects; attending meetings in lieu of Council members; administering the Residential Parking Permit District Program; designing and implementing special programs; and operating and maintaining databases.

***Training Coordinator*** **–** 1985 to 1992 *Lexington-Fayette Urban County Detention Center*
Lexington, Kentucky
Responsible for developing, implementing, coordinating, and supervising the Division of Community Correction's Training Division; supervising all training-related activities; developing curriculum and conducting pre-and in-service training for all staff members; performing needs assessments; analyzing job tasks for all areas of the organization; and recommending, drafting, and editing all policies and procedures. Advanced through ranks of Corporal, Sergeant and Lieutenant.

***Detention Officer*** **–** 1984 to 1985 *Lexington-Fayette Urban County Detention Center*
Lexington, Kentucky
Responsible for the care custody and supervision of an offender population within an assigned area.

***United States Marine Corps*** **–** 1972 to 1974 Corporal - Honorable Discharge

## Education

***Doctorate in Public Administration,*** 2005, Kennedy-Western University, Cheyenne, Wyoming



EXHIBIT D

***Master of Arts (I)*** coursework degree in Geography, 1979 to 1980, University Of Kentucky, Lexington, Kentucky

***Bachelor of General Studies***, 1978, University of Kentucky, Lexington, Kentucky; Area of study in Sociology, Psychology and Political Science

## Publications

"The Use of Force Continuum: Is it Worth Keeping?" (Part 2) Collins, William; Swartz, Jeffrey; and Leach, Donald, Correctional Law Reporter, May/June 2011

"The Use of Force Continuum: Is it Worth Keeping?" (Part 1) Collins, William; Swartz, Jeffrey; and Leach, Donald, Correctional Law Reporter, December/January 2011

"Arrestee Strip Searches: An Administrator's View," Correctional Law Reporter, July/August 2010

"How should agencies manage transgender offenders? An interview with Jail Risk Management Consultant Donald L. Leach," Leach, Donald and Whyte, Luke; Corrections One, www.correctionsone.com/correctional-healthcare/articles/2082675-How-should-agencies-manage-transgender-offenders/

"PREA Redux: What's It Going to Cost?" American Jail, July/August 2010

"PREA Redux: What's It Going to Cost?" Correctional Law Reporter, December/January 2010

"Prison Rape Elimination Act Lives On," Correctional Managers Report, December/January 2009

"Carrots versus Sticks: Managing Behavior in the Jail," American Jails, Hagerstown: November/December 2008

"PREA Draft Standards are PREA 'DAFT" Standards," Correctional Managers Report, August 2008

"Carrots versus Sticks: Managing Behavior in the Jail," Correctional Managers Report, April/May 2008

"Issues Surrounding Managing Lesbian, Gay, Bi-sexual, Transsexual, and Intersex Offenders (LGBTI) in Jails," American Jails, Hagerstown: November/December 2007; LJN Exchange, National Institute of Corrections, US Department of Justice, 2006; and Corrections Professional, November 2007

"Excited Delirium: Fact or Fiction," LJN Exchange, National Institute of Corrections, US Department of Justice, 2007

"Are Tasers in Jails a Great New Tool or Another Headache," LJN Exchange, National Institute of Corrections, US Department of Justice, 2006

"Mission Creep and the Role of the Jail in Public Health Policy," LJN Exchange, National Institute of Corrections, US Department of Justice, 2004

Creating a New Jail Management Paradigm, 2004 Published Dissertation

"Journey into Objective Jail Classification," Leach, Don and Sabbatine, Ray, American Jails, Hagerstown: Jan 1999

"A New Strip Search Paradigm," Leach, Don and Sabbatine, Ray, American Jails, Hagerstown: November/December 1996

## Professional Affiliations

*American Correctional Association (ACA)* – Member

*American Jail Association (AJA)* – Member, Board of Directors, 2006 – 2010

*Americans for Effective Law Enforcement (AELE)* – Faculty Instructor "Jail and Prison Legal Issues"

*Association of Force Investigators* - Member

*Institute for the Prevention of In-Custody Deaths (IPICD)* – Member



EXHIBIT D

## Training & Certifications

***American Jail Association Training Seminar Instructor***
*Developing Religious Programs in Jails*
*Growing and Special Populations*
*Leadership and Ethics in Jails*
*Managing Security Threat Groups and Gangs*
*Managing Special Populations*
*Managing the Generations in our Jails*
*Objective Jail Classification*
*Sexuality in the Jail:Managing Lesbian, Gay, Bisexual, Transgender and Intersex Inmates*
***Certified Class D Coach,*** United States Judo Association, Incorporated
***Certified Correctional Trainer***, National Academy of Corrections
***Certified Firearms Instructor***, Federal Bureau of Investigation
***Certified Law Enforcement Instructor,*** Commission on Law Enforcement Standards and Training, Arkansas
***Certified Spit Mask Instructor,*** Institute for the Prevention of In-Custody Deaths
***Certified Self-Defense Instructor***, National Academy of Corrections
***Emergency Medical Technician-Basic,*** Lexington-Fayette Urban County Division of Fire and Emergency Services
***WRAP Restraint System -*** Instructor Certification
***Media Relations for Law Enforcement***, Chris Ryan Seminars
***National Institute of Corrections Training Seminars***
*Assessing Tomorrow's Leadership*
*Developing Objective Jail Classification Systems – Instructor*
*Enhancing Human Resource Systems*
*Inmate Behavior Management – Instructor*
*Jail Design and Review*
*Managing the Medium-size Jail – Instructor*
*Managing the Small Jail – Instructor*
*Organizational Diagnosis and Change*
*Systematic Methods for Effective Decision Making*
*Training Development and Design*
***Public Safety Disability Specialist,*** Institute for the Prevention of In-Custody Deaths
***Recognition, Prevention, and Management of Excited Delirium and Sudden In-custody Deaths Instructor***, Institute for the Prevention of In-Custody Deaths
***Sensei (Instructor) 4 Seasons MMA/Kukuchi-do Judo Team,*** Third Degree Black Belt (Sandan), Judo
***Use of Force by the Numbers-Train-the-Trainer,*** Institute for the Prevention of In-custody Deaths
***Video Examinations for the Use of Force Investigator Course,*** Forensic Video Solution



EXHIBIT D

**DONALD L. LEACH II**
*Donald L. Leach & Associates, Ltd.*
*2130 East Wasatch Boulevard, Sandy, Utah 84092*
*donald.leach@me.com*

# Fee Schedule and Agreement for Services

## *Case Review and Opinion*

After receipt of the retainer fee of $5,000, a review of all materials furnished will be completed on a timely basis. A review of all materials provided will be performed at the rate of $250.00 per hour, with the retainer fee applied to the first 20 hours of work. The retainer fee is non-refundable and must accompany this signed Fee Agreement acknowledging Donald Leach's participation in the case as an expert. However, the initial $5,000 fee includes only 20 hours of a materials review. If requested or required, a written report will be completed at the rate of $250 per hour, which will be in addition to the minimum file review fee of $5,000. All additional file review hours over the initial 20 hours will be invoiced at $250 per hour.

Designating Donald Leach as an expert in any case without signing the Fee Schedule and Agreement for Services and paying the minimum retainer fee is prohibited. All work performed, exclusive of depositions, trials, conferences, and site inspections, will have separate and additional fees as discussed below, will be assessed at $250.00 per hour.

Once retained, a review of the case will commence. If the fee arrives before case materials are sent or received, the receipt of the retainer fee is considered an agreement to retain. Receipt of the case materials or listing of Donald Leach as your expert or potential expert without the retainer fee enclosed will be considered an obligation and commitment to pay the retainer fee and to meet this Fee Schedule and Agreement for Services in its entirety. Timing of settlements, summary judgment, or any other action that might impact the case either before or after the retainer fee has been paid will have no effect on the obligation to meet this agreement's requirements and pay the required fees.

At the point that the number of hours equal to the retainer has been expended in reviewing materials and/or consultation, you will be notified, and a determination to continue will be made jointly between the contracting attorney and Donald Leach. The decision to continue will result in the billing of additional hours at the hourly rate of $250.00 per hour. Payment of any additional hours may be required before the continuation of review and the provision of a written opinion.

Gaps in time during the case will result in the necessity of extensive preparation time to refresh and prepare for deposition, and/or trial, and will be billed at the rate of $250.00 per hour. Should more than 24-months elapse between initial work completed and new case activity be required, I reserve the right to bill at the fee rate current at that time.

## *Site Inspection or Conference Requests*

Donald Leach and the contracting party or designee will conduct a site visit as necessary. Donald Leach will travel to the site of the incident in question and complete an inspection of the incident site. Donald Leach will meet for conference as is necessary, or requested, to prepare a written expert report; for deposition; or, for trial. The daily fee for both site inspection or conference will be billed at $1,500.00 per day. These fees shall be paid upon arrival at the site or at the time of the conference.

## *Depositions*

Depositions, at a location selected by Donald Leach, will be billed at a fee of $2,500.00 for the first 5-hours and $400 per hour for any subsequent time (video depositions are $3500 for the first 5-hours and $400 per hour for any subsequent time) with a maximum of seven (7) hours of testimony per day. Depositions scheduled at locations convenient to the deposing counsel will be billed at the above-listed rates. A full 8-hour day (7-hours maximum testimony time) will be set aside by Donald Leach, and no other business will be scheduled regardless of the beginning hour of the deposition. The retaining firm shall represent the above deposition fees and payment policies to opposing counsel before the deposition. In the event of any disagreement as to the amount, the firm retaining Donald Leach shall pay the difference or the full amount in accordance with this deposition fee schedule at the beginning of the deposition. If a case settles or deposition canceled, within 48-hours before the scheduled deposition date, a $1,000 cancellation fee will be assessed. Failure of either party to have fees before deposition



EXHIBIT D

will result in cancellation of the deposition with the cancellation fee of $1,000.00 assessed. If canceled or settled, cancellation fees are due within 15-days.

Video conference (not video archived) depositions MUST be scheduled at a local media center or court reporter's office, whether accomplished by Zoom, Skype, or another teleconferencing method, even if the retained court reporter is on the other end. Donald Leach takes no responsibility for technical transmission interruptions; therefore, this is a firm policy. Donald Leach will not use his equipment or wi-fi for this type of scheduled deposition.

***Trial Testimony***

Thorough preparation will be done before trial and billed at $250.00 per hour. Donald Leach will reserve the agreed-upon trial day for a fee of $3,500.00, minimum, plus all travel expenses incurred as outlined below, for each day or portion of a day testifying. Any standby days/portions of a day awaiting trial will be assessed at $1,000.00 per day. If trial is attended but not called to testify during that trip, the trial fee of $3,500.00 will be assessed for one of the days while waiting to testify. Repeat trips to trial will be billed similarly. All fees in connection to testifying including, preparation fees standby fees travel expense, or other outstanding case fees must be paid before Donald Leach takes the stand. Only minor extraordinary travel expenses will be billed. **The trial fee will be charged if the case settles or is otherwise dismissed, or rescheduled, within 72-hours (excluding Saturday and Sunday) of scheduled testimony.** The trial preparation fee, based upon actual hours of preparation time will be assessed if the cancellation of trial testimony occurs within two weeks (14-days) of scheduled testimony, as trial preparation will have been completed. Cancellation fees are due within 15-days of notice of cancellation or settlement.

***Travel Expenses***

Donald Leach will book all airline, hotel, and car rental reservations to facilitate coordinating his schedule. An unrestricted first-class ticket will be billed for all air travel. Travel expenses will be billed at actual costs incurred for airfare, vehicle rental, hotel accommodations, parking, and taxi. Per diem cost for meals will be $50.00 per day. A travel inconvenience fee will be billed at $500.00 each way for travel in lieu of portal to portal charges.

*Publication of Donald Leach's name to opposing counsel in any document, as your witness, consultant, or potential witness shall occur only after Donald Leach has been retained and the above fees paid. Listing of Donald Leach's name in any document obligates payment of the fee in full.*

**I HAVE READ THIS FEE SCHEDULE IN ITS ENTIRETY AND AGREE TO THE TERMS THEREIN.**

______________________________
Case Title or Case Name:

______________________________
Donald L. Leach

______________________________
Signature of Retaining Attorney

______________________________
Typed or Printed Name of Attorney Retaining

______________________________
Date

**Please Copy and Return Original, Signed Electronic Copies are Acceptable**



EXHIBIT D

***Revised: October, 2024***

## CASE HISTORY - RULE 26 A) 2) B) V) DISCLOSURE

**Donald L. Leach II**

Cases in which I have testified in court or deposition in the past four years per Rule 26 a) 2) B) v):

1. *Estate of Charles Lee Rose v. Wayne Co Fiscal Court, et al.*, Wayne County Circuit Court, Case No: 16-CI-00265 (10/2024) ***Defense-In-custody Death***
2. *Estate of Dean Funabiki by and through personal representative, Rich Funabiki, Abby Funabiki and Emily Funabiki, ,v. County of Whitman; John Doe 1 and Does 4–5,* U.S. District Court, Eastern District of Washington, Case No. 2:21-CV-00089-RMP (05/2024) ***Defense-Suicide***
3. *Frances Beach, as Administrator of The Estate of Eric Griffith v. William Grady, in his individual capacity, Curtis Thompson, in his individual capacity, Michael Pittman, in his individual capacity, Wayne Coats, in both his individual capacity and his official capacity as Sheriff OF Harnett County, North Carolina, Harnett County, and Travelers Casualty and surety Company of America,, as Surety for the Sheriff of Harnett County,* U.S. District Court, Eastern District of North Carolina, Western Division, Civil Action No. 5:23-CV-329-D-RN (05/2024) ***Plaintiff-In-custody Death***
4. *Estate of Madison Jody Jensen v. Duchesne County, David Boren, Jared Harrison, Jason Curry, Jana Clyde, Logan Clark and John Does 1-20*, U.S. District Court, District of Utah, Central Division, Civil No. 2:17-cv-01031 (03/2024) ***Plaintiff-In-custody Death***
5. *Deea Miller, Administrator of the Estate of Kacey Miller v. Vermillion County, John Doe Sheriff's Deputies 1-4, Crosspoint Human Services, John Doe employees 1-3, and James Dewey,* U.S. District Court, Central District of Illinois, Urbana Division, Case No. 22-cv-2029-CRL-KLM (03/2024) ***Defense-Suicide***
6. *Jerry Sanford and Stephanie McClure, Co-Administrators of the Estate of Jonathan Sanford v. Dawson County Sheriff Jeff Johnson, Dawson County Sheriff's Deputies and/or Jailer Zachary Totherow, Donald S. Lewis, Stephen D. Holloway, William D. Johnson, Michael A. Wharton, Madison A. Elder, David Lingerfelt, and Theresa Kirby,* U.S. District Court, Northern District of Georgia, Gainesville Division, Civil No. 2:22-cv-00078-RWS (03/2024) ***Plaintiff-In-custody Death***
7. *Bobby Joe Poynter v. Whitley County Detention Center, Whitley County Fiscal Court, Brian Lawson, Steve Claxton, and Bobby Chancellor*, U.S. District Court, Eastern District of Kentucky, Southern Division at London, 6:21-cv-00058-KKC (01/2023) ***Defense-Use of Force***
8. *Katrina Woodall, Katana Johnston, Kelly Davis, and LaToya Hearst, v. Wayne County and Officer Teri Graham*, U.S. District Court, Eastern District of Michigan, Number 2:17-cr-13707-LJM-EAS (01/2023) ***Plaintiff-Strip Search***
9. *Nicole DeSimone v. Flagler County, Rick Staley, Steve Cole, Becky Quintieri, Bradley Gilyard, Julio Vazquez, and Jonathan Vitale*, U.S. District Court, for the Middle District of Florida, Jackson Division, 3:20-cv-1242-TJC-MCR (12/2022) ***Defense-Facility Design***
10. *United States of America v. Seth Bourget and Joseph M. Lavorato,* U.S. District Court, District of Massachusetts, Number 1:20-cr-10029-DJC (03/2022) ***Prosecution-Use of Force-Criminal Civil***



EXHIBIT D

***Rights Trial***

11. *People of the State of Colorado, v. Andrew McCormick,* County Court, Adams County, Colorado, C0012020M004010 (11/2021) ***Defense-Use of Force-Criminal Trial***

12. *People of the State of Colorado, v. Walter Berlinski,* County Court, Adams County, Colorado, 2019CR4494 (10/2021) ***Defense-Use of Force-Criminal Trial***

13. *Brian Johnson v. Mike Dobbins, et al.,* U.S. District Court, Middle District of Tennessee, Nashville Division, 3:19-CV-01160 (10/2021) ***Defense-ADA Issues/Conditions of Confinement***

14. *Tom Montgomery, et al., v. King County, et al.,* U.S. District Court, Western District of Washington at Seattle, 20-cv-00855-RAJ (10/2021) ***Defense-Suicide***

15. *Omar Wesley v. Wisconsin Community Services, et al.,* U.S. District Court, Eastern District of Wisconsin, 19-cv-00918 (09/2021) ***Defense-Medical Care/Community Supervision***

16. *Nick J. Epps v. Gary Ferguson, et al.,* Bell Circuit Court, Commonwealth of Kentucky, 17-CI-00388 (07/2021) ***Plaintiff-Medical Care***

17. *Estate of Brianna Lynn Beland v. Charleston County Sheriff's Office, et al.,* Court of Common Pleas, Charleston, 2019-CP-10-1809 (06/2021) ***Defense-Medical Care/In-custody Death***

18. *S.L.C., S.E.R., S.A.L.M. v. Polk County Sheriff's Department and Darryl Christensen*, U.S. District Court, Western District of Wisconsin, 3:16-cv-00630-WMC, 3:16-cv-00631-WMC and 3:16-cv-00632-WMC (04/2021) ***Defense-Failure to Protect/PREA Issues***

19. *Carol Herriges v. County of Macomb, et al.,* U.S. District Court, Eastern District, 19-cv-12193 (11/2020) ***Plaintiff-Suicide***

20. *Pia Sacchetta v. Lake County Sheriff, Peyton C. Grinnell, et al.,* Circuit Court of the Fifth Judicial Circuit, Lake County, Florida, 5:19-cv-00561-JSM-PRL (10/2020) ***Plaintiff-Medical Care/In-custody Death***

21. *Amy Hill v. Okmulgee County Criminal Justice Authority, et al.,* U.S. District Court of Oklahoma, Eastern District, 18-394-SPS (05/2020) ***Plaintiff-Use of Force***

22. *Joshua Reece v. Shelby County, Kentucky D/B/A Shelby County Detention Center, et al.,* U.S. District Court, Eastern District of Kentucky, Frankfort Division, 3:16-cv-69-GFVT (03/2020) ***Defense-Staff Misconduct***

23. *Euron Matthew v. Jake Debus, et al.,* U.S. District Court, Northern District of Illinois, Eastern Division, 1:14-cv-06003 (02/2020) ***Plaintiff-Use of force***

24. *Kevin Younger v. Jemiah L. Green,* U.S. District Court, District of Maryland, 24-C-17-0047S2 OC (01/2020) ***Plaintiff-Use of Force/Staff Misconduct***

25. *Euron Matthew v. Jake Debus, et al.,* U.S. District Court, Northern District of Illinois, Eastern Division, 1:14-cv-06003 (01/2020) ***Plaintiff-Use of Force***

***Project History-Presentation, Training & Consulting Activities*** ***Donald L. Leach II***

| *Date* | *Event* | *Jurisdiction* | *Sponsor* |
|---|---|---|---|
| August-93 | NIC Objective Jail Classification Phase 2 Audit-Middle Peninsula Regional Jail | Saluda, Virginia | National Institute of Corrections |
| April-94 | AJA Objective Jail Classification-200+ in workshop-Presenter | St. Louis, Missouri | American Jail Association and National Institute of Corrections |
| May-95 | AJA Objective Jail Classification-200+ in workshop-Presenter | Cincinnati, Ohio | American Jail Association and National Institute of Corrections |
| September-95 | Objective Jail Classification-Multijurisdictional Law Enforcement Conference-Presenter | Green Bay, Wisconsin | Bureau of Indian Affairs |
| December-95 | NIC Objective Jail Classification Phase 1, 15 Counties-Presenter | Longmont, Colorado | National Institute of Corrections |
| February-96 | NIC Objective Jail Classification Phase 1, 15 Counties-Presenter | Longmont, Colorado | National Institute of Corrections |
| April-96 | Distance Learning, "To Strip or Not to Strip: That is the Question"-Satellite Training Program | Richmond, Kentucky | Eastern Kentucky University |
| April-96 | NIC Objective Jail Classification Phase 2 Audit-Lake County Sheriff's Office | Panesville, Ohio | National Institute of Corrections |
| May-96 | AJA Objective Jail Classification-175+ in workshop-Presenter | St. Louis, Missouri | American Jail Association and National Institute of Corrections |
| May-96 | NIC Objective Jail Classification Phase 2 Audit-Hennepin County Department of Corrections | Minneapolis, Minnesota | National Institute of Corrections |
| August-96 | NIC Objective Jail Classification Phase 1, 15 Counties-Planning and Development-Presenter | Longmont, Colorado | National Institute of Corrections |
| August-96 | NIC Objective Jail Classification Phase 2 Audit-Pike County Prison | Lords Valley, Pennsylvania | National Institute of Corrections |
| September-96 | NIC Objective Jail Classification Workshop Minnesota Sheriffs Association-30 Jurisdictions-Presenter | Brainard, Minnesota | National Institute of Corrections |
| September-96 | NIC Objective Jail Classification Phase 2 Audit-Adams County Sheriff's Office | Brighton, Colorado | National Institute of Corrections |
| February-97 | NIC Objective Jail Classification Phase 2 Audit-Shelby County Sheriff's Office | Memphis, Tennessee | National Institute of Corrections |
| April-97 | NIC Objective Jail Classification Orientation Training-Okanogan County Sheriff's Department-Presenter | Okanogan, Washington | National Institute of Corrections |
| May-97 | NIC Objective Jail Classification State Initiative-Badger State Sheriff's Association-10 Jurisdictions-Presenter | Madison, Wisconsin | Badger State Sheriff's Association and National Institute of Corrections |
| May-97 | AJA Objective Jail Classification-200+ in workshop-Presenter | Salt Lake City, Utah | American Jail Association and National Institute of Corrections |



EXHIBIT D

| | | | |
|---|---|---|---|
| June-97 | NIC Objective Jail Classification Phase 2 Audit-Richland County Jail | Columbia, South Carolina | National Institute of Corrections |
| June-97 | NIC Objective Jail Classification Phase 1, 15 Counties-Presenter | Longmont, Colorado | National Institute of Corrections |
| July-97 | NIC Objective Jail Classification Phase 1, 15 Counties-Presenter | Longmont, Colorado | National Institute of Corrections |
| July-97 | NIC Objective Jail Classification Phase 2 Audit-Martinsville City Sheriff's Office | Martinsville, Virginia | National Institute of Corrections |
| September-97 | NIC Objective Jail Classification State Initiative-South Carolina Sheriff's Association-Presenter | Columbia, South Carolina | National Institute of Corrections |
| September-97 | NIC Objective Jail Classification Phase 2 Audit-Dodge County Sheriff's Department | Beaver Dam, Wisconsin | National Institute of Corrections |
| November-97 | Objective Jail Classification-National Training Conference for Criminal Justice and Community Leaders-Presenter | Green Bay, Wisconsin | Department of Justice |
| November-97 | Adjunct Technical Assistance-Management and Operations - Brown County Sheriff's Office | Green Bay, Wisconsin | Department of Justice |
| November-97 | NIC Objective Jail Classification State Initiative-Virginia-Presenter | Hampton Roads, Virginia | National Institute of Corrections |
| November-97 | NIC Objective Jail Classification State Initiative-South Carolina-Phase 1-Presenter | South Carolina | South Carolina Sheriff's Association, South Carolina Department of Corrections and National Institute of Corrections |
| January-98 | NIC Objective Jail Classification Phase 2 Audit-Franklin County House of Corrections | Greenfield, Massachusetts | National Institute of Corrections |
| January-98 | NIC Objective Jail Classification Phase 4 Final Audit-Middle Peninsula Regional Jail | Saluda, Virginia | National Institute of Corrections |
| April-98 | AJA Objective Jail Classification-200+ Two workshops-Presenter | Cincinnati, Ohio | American Jail Association and National Institute of Corrections |
| July-98 | NIC Objective Jail Classification Phase 1, 15 Counties-Presenter | Longmont, Colorado | National Institute of Corrections |
| August-98 | NIC Objective Jail Classification Phase 4 Final Audit-Jackson County Sheriff's Office | Jackson, Minnesota | National Institute of Corrections |
| September-98 | Planning of New Institutions-Facility Design-Presenter | Longmont, Colorado | National Institute of Corrections |
| December-98 | NIC Objective Jail Classification Phase 4 Final Audit-Buncombe County Sheriff's Office | Ashville, North Carolina | National Institute of Corrections |
| January-99 | NIC Objective Jail Classification Phase 2 Audit | Norfolk, Virginia | National Institute of Corrections |
| March-99 | NIC Objective Jail Classification Phase 2 Audit-Richland County Jail | Columbia, South Carolina | National Institute of Corrections |



EXHIBIT D

| | | | |
|---|---|---|---|
| March-99 | NIC Objective Jail Classification State Initiative-South Carolina-Phase 2-Presenter | Columbia, South Carolina | South Carolina Sheriff's Association, South Carolina Department of Corrections and National Institute of Corrections |
| March-99 | NIC Objective Jail Classification Phase 3 Workshop-Presenter | Longmont, Colorado | National Institute of Corrections |
| May-99 | AJA Objective Jail Classification-200+ in workshop-Presenter | Fort Worth, Texas | American Jail Association and National Institute of Corrections |
| June-99 | NIC Objective Jail Classification State Initiative- Wisconsin-Presenter | Green Bay, Wisconsin | National Institute of Corrections |
| August-99 | NIC Objective Jail Classification State Initiative-South Carolina County Jail Administrators Association | Columbia, South Carolina | South Carolina County Jail Administrators Association and National Institute of Corrections |
| September-99 | NIC Objective Jail Classification Phase 1, 15 Counties-Presenter | Longmont, Colorado | National Institute of Corrections |
| February-00 | NIC Objective Jail Classification Phase 2 Audit-Navaho County Sheriff's Office | Holbrook, Arizona | National Institute of Corrections |
| May-00 | AJA Objective Jail Classification-200+ in workshop-Presenter | Sacramento, California | American Jail Association and National Institute of Corrections |
| November-00 | NIC Objective Jail Classification Phase 2 Audit-Finney County Sheriff's Office | Garden City, Kansas | National Institute of Corrections |
| January-01 | NIC Objective Jail Classification Phase 2 Audit-Hampton Roads Regional Jail | Hampton Roads, Virginia | National Institute of Corrections |
| March-01 | NIC Objective Jail Classification Phase 2 Audit-Douglas County Department of Corrections | Omaha, Nebraska | National Institute of Corrections |
| April-01 | NIC Objective Jail Classification Phase 2 Audit-Jacksonville Sheriff's Office | Jacksonville, Florida | National Institute of Corrections |
| May-01 | AJA Objective Jail Classification-150+ Workshop-Presenter | Columbus, Ohio | American Jail Association and National Institute of Corrections |
| July-01 | NIC Objective Jail Classification State Initiative-South Carolina-Phase 2-Presenter | Richmond, Virginia | National Institute of Corrections and Virginia Department of Corrections |
| November-01 | NIC Objective Jail Classification Phase 2 Audit-Cheshire County Department of Corrections | Keene, New Hampshire | National Institute of Corrections |
| March-02 | Marion County Community Corrections Needs Assessment Study | Indianapolis, Indiana | Voorhis/Robertson Justice Services, Inc. |
| April-02 | AJA Objective Jail Classification-100 in 2 Workshops-Presenter | Milwaukee.Wisconsin | American Jail Association and National Institute of Corrections |
| April-02 | Community Corrections Needs Assessment-Lake County Sheriff's Office | Crown Point, Indiana | Voorhis/Robertson Justice Services, Inc. |
| May-02 | Risk Management Review-Shreveport City Jail | Shreveport, Louisiana | Voorhis/Robertson Justice Services, Inc. |



EXHIBIT D

| | | | |
|---|---|---|---|
| September-02 | NIC Objective Jail Classification State Initiative Arizona-25 Jurisdictions | Phoenix, Arizona | National Institute of Corrections |
| November-02 | NIC Objective Jail Classification Phase 4 Audit-Dodge County Sheriff's Department | Beaver Dam, Wisconsin | National Institute of Corrections |
| May-03 | Policy and Procedure Review-Steele County | Steele County, Minnesota | Voorhis/Robertson Justice Services, Inc. |
| May-03 | AJA Presentation on Objective Jail Classification-150+ in 2 Workshops | Albuquerque, New Mexico | American Jail Association and National Institute of Corrections |
| June-03 | Classification and Transitioning to a New Jail Implementation and Assessment-Cache County Sheriff's Office-Presenter | Logan, Utah | National Institute of Corrections |
| October-03 | Classification and Transitioning to a New Jail Implementation and Assessment Wayne County Sheriff's Department-Presenter | Richmond, Indiana | National Institute of Corrections |
| October-03 | Informational Pamphlet-Corrections in the United States | The Netherlands | Ministry of Justice, Netherlands |
| January-04 | NIC-Large Jail Network Conference Presentation-Role of the Jail in Public Health Policy-Presenter | Longmont, Colorado | National Institute of Corrections |
| February-04 | NIC Objective Jail Classification State Initiative Arizona Detention Association-14 Jurisdictions | Phoenix, Arizona | Arizona Detention Association and National Institute of Corrections |
| March-04 | Classification Implementation Review St. Lucie County Sheriff's Office | Fort Pierce, Florida | Voorhis/Robertson Justice Services, Inc. |
| April-04 | AJA Objective Jail Classification-100+ in 2 Workshops-Presenter | Birmingham, Alabama | American Jail Association and National Institute of Corrections |
| April-04 | AJA Role of Jail in Public Health Policy-50+ in workshop-Presenter | Birmingham, Alabama | National Institute of Corrections |
| April-04 | Classification and Transitioning to a New Jail Implementation and Assessment-Strafford Country House of Corrections | Dover, New Hampshire | National Institute of Corrections |
| May-04 | Classification Overview Training St. Lucie County Sheriff's Office-Presenter | Fort Pierce, Florida | Voorhis/Robertson Justice Services, Inc. |
| July-04 | Operational Assessment, Management Planning and Implementation Bernalillo County Department of Corrections | Albuquerque, New Mexico | Voorhis/Robertson Justice Services, Inc. |
| January-05 | AJA Objective Jail Classification Workshop-28 in workshop-Presenter | Reno, Nevada | American Jail Association |
| February-05 | NIC Objective Jail Classification State Initiative-8 Jurisdictions-Presenter | Omaha, Nebraska | National Institute of Corrections |
| August-05 | Classification Implementation Review and Assessment-Sonoma County Sheriff's Department | Santa Rosa, California | National Institute of Corrections |
| October-05 | NIC Objective Jail Classification Workshop and Assessment-Bristol County Sheriff's Office-Presenter | New Bedford, Massachusetts | National Institute of Corrections |



EXHIBIT D

| | | | |
|---|---|---|---|
| January-06 | NIC-Large Jail Network Conference-"Another Tool or Headache-Tasers in Jails"-Presenter | Longmont, Colorado | National Institute of Corrections |
| March-06 | AJA Objective Jail Classification Workshop-60 in workshop-Presenter | Tampa, Florida | American Jail Association |
| April-06 | Classification System Assessment-Tulsa County Sheriff's Department | Tulsa, Oklahoma | National Institute of Corrections |
| April-06 | Inmate Behavior Management Seminar-12 Jurisdictions-Presenter | Longmont, Colorado | National Institute of Corrections |
| May-06 | NIC Objective Jail Classification State Initiative Michigan-15 Jurisdictions-Presenter | Port Huron, Michigan | National Institute of Corrections, St. Clair County Sheriff's Office, Michigan Municipal Risk Management Authority |
| May-06 | AJA Annual Training Conference-Board Induction, Conference Management-Presenter | Salt Lake City, Utah | American Jail Association |
| June-06 | Objective Jail Classification Overview-Kentucky Jailer's Association Training Conference-Presenter | Owensboro, Kentucky | Kentucky Jailer's Association |
| June-06 | Classification System Assessment-Prentiss County Sheriff's Department | Booneville, Mississippi | National Institute of Corrections |
| July-06 | NIC-Large Jail Network Conference Moderator of "Hot Topics" Discussions | Longmont, Colorado | National Institute of Corrections |
| July-06 | AJA Objective Jail Classification Workshop-Las Vegas, Nevada-Presenter | Las Vegas, Nevada | American Jail Association |
| September-06 | Classification System Assessment-St. Lucie County Sheriff's Office | Fort Pierce, Florida | National Institute of Corrections |
| September-06 | 2nd Annual National Crisis Intervention Team Conference Presentation, Jail's Role in Crisis Intervention Teams-Presenter | Orlando, Florida | National Institute of Corrections |
| October-06 | AJA Board Business Meeting | Hagerstown, Maryland | American Jail Association |
| October-06 | Classification System Assessment-Mecklenburg County Sheriff's Office | Charlotte, North Carolina | National Institute of Corrections |
| November-06 | NIC Objective Jail Classification State Initiative Mississippi-15 Jurisdictions-Presenter | Jackson, Mississippi | Mississippi Sheriff's Association, Mississippi Department of Corrections and National Institute of Corrections |
| November-06 | Kentucky Jailer's Association-Developing Grievance Policies, Objective Jail Classification Overview, Grant Opportunities-Presenter | Lexington, Kentucky | Kentucky Jailer's Association |
| January-07 | NIC-Large Jail Network Conference Moderator of "Hot Topics" Discussions | Longmont, Colorado | National Institute of Corrections |
| February-07 | NIC Objective Jail Classification Workshop-Sonoma County Sheriff's Office | Santa Rosa, California | National Institute of Corrections, Sonoma County Sheriff's Office |
| February-07 | NIC Objective Jail Classification Workshop-Santa Cruz County Sheriff's Office | Santa Cruz California | National Institute of Corrections, Santa Cruz County Sheriff's Office |



EXHIBIT D

| | | | |
|---|---|---|---|
| March-07 | AJA Objective Jail Classification Workshop-San Diego, California-Presenter | San Diego, California | American Jail Association |
| March-07 | Objective Jail Classification Overview-Oregon Sheriff's Association-Presenter | Portland, Oregon | Oregon Sheriff's Association and American Jail Association |
| April-07 | Classification System Assessment-San Diego Sheriff's Department | San Diego, California | National Institute of Corrections |
| May-07 | AJA Annual Training Conference Seminars-"Managing Gangs with OJC"; "Thinking Outside the Box"; "Managing the Axis II Offender"-Presenter | Nashville, Tennessee | American Jail Association |
| May-07 | Gang Intelligence Strategy Committee, Global Justice Information Sharing Initiative's (Global) Intelligence Working Group | Washington, DC | Bureau of Justice Assistance (BJA), Office of Justice Programs, U.S. Department of Justice |
| June-07 | Focus group on the Future of Jails and BJA funding | Orlando, Florida | Bureau of Justice Assistance (BJA), Office of Justice Programs, U.S. Department of Justice |
| July-07 | AJA Objective Jail Classification Workshop-Presenter | Denver, Colorado | American Jail Association |
| September-07 | NIC-Large Jail Network Conference Moderator of "Hot Topics" Discussions, "Excited Delirium: Fact or Fiction"-Presenter | Denver, Colorado | National Institute of Corrections |
| October-07 | AJA Board Business Meeting, Resolutions Committee, Legislative Committee Discussion | Hagerstown, Maryland | American Jail Association |
| November-07 | Funding recommendation workshop for BJA funding "The Future of Jails and Funding Initiatives" | Orlando, Florida | Bureau of Justice Assistance (BJA), Office of Justice Programs, U.S. Department of Justice |
| December-07 | Developing Religious Programs in Jails Workshop-Presenter | Anaheim, California | American Jail Association |
| January-08 | Mobile Team Unit 11-Training Seminars-3 Jurisdictions-Presenter | Decatur, Illinois | Central Illinois Regional Commission for Law Enforcement |
| January-08 | AJA Objective Jail Classification Workshop-Presenter | Fort Walton Beach, Florida | American Jail Association |
| February-08 | Classification System Assessment-Multnomah County Sheriff's Department | Portland, Oregon | National Institute of Corrections |
| March-08 | NIC-Large Jail Network Conference Moderator of "Hot Topics" Discussions, "Contracting Jail Services"-Presenter | Denver, Colorado | National Institute of Corrections |
| April-08 | South Carolina Jil Administrtator's Association, "Taking Your Jail Outside the Box" and "Managing Axis II Offenders"-Presenter | Myrtle Beach, South Carolina | South Carolina Jail Administrators Association and the National Institute of Corrections |
| April-08 | Classification System Development and Implementation-Brunswick County Sheriff's Department | Bolivia, North Carolina | National Institute of Corrections |
| April-08 | Baltimore County Department of Corrections - Gangs and their Management in Jails-Presenter | Baltimore, Maryland | American Jail Association |
| May-08 | AJA Annual Training Conference Seminars-"Managing Gangs with OJC"; "Sexualtiy in the Jail and Transsexuals"-Presenter; Induction to 3rd Vice Presidency | Sacramento, California | American Jail Association |



EXHIBIT D

| | | | |
|---|---|---|---|
| May-08 | Prison Rape Elimination Commission-AJA Representative for Public Comment | Washington, DC | American Jail Association |
| May-08 | Policy, Procedure and Personnel Issues Review-Hudson County Corrections Department | Jersey City, New Jersey | Voorhis/Robertson Justice Services, Inc. |
| June-08 | AJA Objective Jail Classification Workshop-Presenter | Reno, Nevada | American Jail Association |
| June-08 | Personnel Issues Review-Hudson County Corrections Department | Jersey City, New Jersey | Voorhis/Robertson Justice Services, Inc. |
| July-08 | Classification System Development and Implementation-Brunswick County Sheriff's Department | Bolivia, North Carolina | National Institute of Corrections |
| July-08 | AJA Managing Gangs Workshop-Presenter | Phoenix, Arizona | American Jail Association |
| August-08 | AJA Motivating the X-Y Generation Employee Workshop-Savannnah, Georgia-Presenter | Savannah, Georgia | American Jail Association |
| August-08 | Expert Witness Opinion Development-Florence v. Essex and Burlington Counties, New Jersey-Strip Search Issues | Georgetown, Kentucky | Sabbatine and Associates |
| August-08 | Objective Jail Classification Implementation Workshop-Dona Ana Detention Center-Presenter | Las Cruces, New Mexico | American Jail Association |
| September-08 | NIC Managing the Medium Jail Seminar-Presenter-21 Jurisdictions | Longmont, Colorado | National Institute of Corrections |
| September-08 | NIC-Large Jail Network Conference Moderator of "Hot Topics" Discussions, "Managing Human Resources-Promotional Practices"-Presenter | Denver, Colorado | National Institute of Corrections |
| September-08 | Classification System Development, Implementation and Transition-Saunders County Sheriff's Department | Wahoo, Nebraska | National Institute of Corrections |
| November-08 | "Managing the X-Y Generations";" Managing the Axis II Offender"; training seminars for Kent County Sheriff's Department-Presenter | Grand Rapids, Michigan | Kent County Sheriff's Department |
| November-08 | "Managing the Gangs in Our Jails" seminar; Wardens Roundtable, Maryland Correctional Administrator's Association-Presenter | Ocean City, Maryland | Maryland Correctional Administrator's Association |
| January-09 | "Objective Jail Classification Seminar - Jail and Prison Legal Issues Workshop - Faculty Presenter | Las Vegas, Nevada | Americans for Effective Law Enforcement |
| January-09 | AJA Objective Jail Classification Workshop-Presenter-9 Jurisdictions | Stockton, California | American Jail Association and San Joaquin Sheriff's Department |
| February-09 | AJA Objective Jail Classification Workshop-Presenter-12 Jurisdictions | Orange Beach, Alabama | American Jail Association and Alabama Jail Association |
| February-09 | AJA Executive Leadership and Succession Planning Workshop | Las Cruces, New Mexico | American Jail Association and New Mexico Association of County Officials |
| February-09 | AJA Executive Leadership and Succession Planning Workshop | Santa Fe, New Mexico | American Jail Association and New Mexico Association of County Officials |



EXHIBIT D

| | | | |
|---|---|---|---|
| March-09 | "Managing the Gangs in Our Jails" seminar; Deputy Wardens Roundtable, Maryland Correctional Administrator's Association-Presenter | Ocean City, Maryland | Maryland Correctional Administrator's Association |
| March-09 | "Managing the X-Y Generations"; training seminar for Keys to Inmate Management Conference-Presenter | Concord, California | Northern California Corrections Association |
| March-09 | Managing the Medium Jail Seminar-Presenter-18 Jurisdictions | Aurora Colorado | National Institute of Corrections |
| March-09 | NIC-Large Jail Network Conference Moderator of "Hot Topics" Discussions, Presentation on "Prison Rape Elimination Act-Update on PRECommission Action"; Presentation on "Managing Lesbian, Gay, Bi-sexual, Transgender and Intersex Offenders"-Presenter | Denver, Colorado | National Institute of Corrections |
| April-09 | AJA Annual Training Conference Seminars-"Media:Friend or Foe"; "Mission Creep"; "Intake: Screening Out Your Headaches"; "Managing the X-Y Generations"; -Presenter; Advancement to 2nd Vice Presidency | Louisville, Kentucky | American Jail Association |
| May-09 | Classification System Development, Implementation and Transition-Ford County Sheriff's Department | Dodge City, Kansas | National Institute of Corrections |
| May-09 | Review of Identification Bureau, Louisville Metro Department of Corrections | Louisville, Kentucky | Louisville Metro Department of Corrections |
| June-09 | AJA Objective Jail Classification Workshop-Presenter | Braintree, Massachuettes | American Jail Association and Norfolk County Sheriff's Office |
| August-09 | Objective Jail Classification Overview-Oklahoma Sheriff's Association-Presenter | Oklahoma City, Oklahoma | Oklahoma Sheriff's Association and National Institute of Corrections |
| August-09 | Managing the Small Jail Seminar-Presenter-12 Jurisdictions | Gulfport, Mississippi | Mississippi Sheriff's Association and National Institute of Corrections |
| September-09 | Key Stakeholder Discussion Regarding Fiscal Impact of Proposed Prison Rape Elimination Act Standards, American Jails Association Representative, Bureau of Justice Assistance, Office of Justice Programs | Washington, DC | American Jail Association |
| September-09 | Managing the Medium Jail Seminar-Presenter-12 Jurisdictions | Aurora Colorado | National Institute of Corrections |
| September-09 | Implication of Prison Rape Elimination Act Standards panel discussion and Managing Gang Behavior in Jails presentation-Presenter | Saratoga Springs, New York | New York Sheriff's Association |
| October-09 | Legal, Psychological and Biomechanical Aspects of Officer-Involved Lethal and Less Lethal Force, Faculty Participant, American for Effective Law Enforcement Seminar | Las Vegas, Nevada | Americans for Effective Law Enforcement |
| October-09 | Use of Force by the Numbers Train-the-Trainer, Institute for the Prevention of In-Custody Deaths, Inc., Certification Seminar | Las Vegas, Nevada | Institute for the Prevention of In-Custody Deaths |
| January-10 | "Objective Jail Classification Seminar - Jail and Prison Legal Issues Workshop - Faculty Presenter | Las Vegas, Nevada | Americans for Effective Law Enforcement |
| January-10 | Recognition, Prevention, and Management of Excited Delirium and Sudden In-custody Deaths | Las Vegas, Nevada | Institute for the Prevention of In-Custody Deaths |
| February-10 | AJA Objective Jail Classification Workshop-Presenter-8 Jurisdictions | Phoenix, Arizona | American Jail Association and Maricopa County Sheriff's Office |



EXHIBIT D

| | | | |
|---|---|---|---|
| February-10 | Merrimack v Mill & Lee, Labor Arbitration Testimony, Excessive Use of Force | Concord, New Hampshire | Merrick County Corrections Department, Merrimack County |
| February-10 | AJA Objective Jail Classification Workshop for Licking County Sheriff's Office-Presenter | Newark, Ohio | American Jail Association and Licking County Sheriff's Office |
| March-10 | Classification and Safety Workshop-In-Service Trainining Class-Presenter | Mt. Clements, Michigan | Macomb County Sheriff's Office |
| April-10 | Merrimack v Mill & Lee, Labor Arbitration Testimony, Excessive Use of Force | Concord, New Hampshire | Merrick County Corrections Department, Merrimack County |
| April-10 | Security and Operational Assessment, Osceola County Corrections Department | Kissimee, Florida | National Institute of Corrections |
| May-10 | AJA Annual Training Conference Seminars-"Sexuaity in the Jail: Managing Gay, Bisexual, Lesbian, Transsexual and Intersex Offenders"; "Preventing In-custody Deaths"-Presenter; 1st Vice President AJA | Portland, Oregon | American Jail Association |
| June-10 | Classification System Assessment-Macomb County | Mt. Clements, Michigan | National Institute of Corrections |
| June-10 | AJA Objective Jail Classification Workshop-Presenter-9 Jurisdictions | Gulfport, Mississippi | American Jail Association, Harrison County Sheriff's Office and Jackson County Sheriff's Office |
| June-10 | Managing the Generations in our Jails-Presenter | Louisville, Kentucky | Kentucky Jailer's Association |
| August-10 | Risk Management in Jails Workshop-Presenter | St. Helens, Oregon | Oregon Sheriff's Jail Command Council |
| September-10 | NIC Managing the Medium Jail Seminar-Presenter | Aurora, Colorado | National Institute of Corrections |
| October-10 | NIC Jail Administration Seminar-Presenter | Oklahoma City, Oklahoma | National Institute of Corrections and Oklahoma Sheriff's Association |
| October-10 | Growing and Special Populations: What are the Solutions?-Presenter | Silverdale, Washington | American Jail Association and Kitsap County Sheriff's Office |
| November-10 | 2010 IPICD Arrest-Related, Excited Delirium, Sudden In-Custody Death Conference | Las Vegas, Nevada | Institute for the Prevention of In-Custody Deaths |
| December-10 | AELE-Discipline and Internal Investigaitons Workshop | Las Vegas, Nevada | Americans for Effective Law Enforcement |
| January-11 | "Objective Jail Classification Seminar - Jail and Prison Legal Issues Workshop - Part 1 - Faculty Presenter | Las Vegas, Nevada | Americans for Effective Law Enforcement |
| February-11 | AJA Objective Jail Classification Workshop-Presenter | Buford, Georgia | American Jail Association and Gwinnett County Sheriff's Office |
| March-11 | Use of Force Decisioning Workshops-Presenter | Louisville, Kentucky | Louisville Metro Department of Corrections |
| March-11 | "Prison Rape Elimination Act Update - Jail and Prison Legal Issues Workshop - Part 2 - Faculty Presenter | Las Vegas, Nevada | Americans for Effective Law Enforcement |



EXHIBIT D

| | | | |
|---|---|---|---|
| May-11 | AJA Annual Training Conference Seminars-"Managing the Generations in Our Jails"-Presenter | Cincinnati, Ohio | American Jail Association |
| May-11 | AJA Objective Jail Classification Workshop-System Adjustment-Presenter | Las Cruces, New Mexico | American Jail Association and Dona Ana Detention Center |
| May-11 | Louisville-Metro Department of Corrections, Employment Compensation Testimony, Excessive Use of Force Termination | Louisville, Kentucky | Louisville Metro Department of Corrections |
| June-11 | AJA Objective Jail Classification Workshop-Presenter | Mt. Pleasant, Michigan | American Jail Association and Michigan Municipal Risk Management Authority |
| June-11 | Louisville-Metro Department of Corrections, Labor Arbitration Testimony, Excessive Use of Force Termination | Louisville, Kentucky | Louisville Metro Department of Corrections |
| September-11 | AJA Objective Jail Classification Workshop-Presenter | Boise, Idaho | American Jail Association and Ada County Sheriff's Office |
| October-11 | Legal, Psychological and Biomechanical Aspects of Officer-Involved Lethal and Less Lethal Force, Faculty Participant, American for Effective Law Enforcement Seminar | Las Vegas, Nevada | Americans for Effective Law Enforcement |
| October-11 | NIC Jail Administration Seminar-Presenter | Little Rock, Arkansas | National Institute of Corrections and Arkansas Criminal Justice Institute |
| November-11 | 2011 IPICD Arrest-Related, Excited Delirium and Sudden In-Custody Death Conference, Presenter, "Symptoms of Distress//Don't DIE in Jail"-Presenter | Las Vegas, Nevada | Institute for the Prevention of In-Custody Deaths |
| December-11 | "Sex in the Jail: Managing Lesbian, Gay, Bi-sexual, Transgender and Intersex Persons" Seminar-Presenter | Augusta, Maine | MCCA Risk Pool |
| January-12 | "Objective Jail Classification Seminar - Jail and Prison Legal Issues Workshop - Part 1 - Faculty Presenter | Las Vegas, Nevada | Americans for Effective Law Enforcement |
| January-12 | "Sex in the Jail: Managing Lesbian, Gay, Bi-sexual, Transgender and Intersex Persons" Seminar-Presenter | Denver, Colorado | Denver Sheriff Department |
| February-12 | AJA Objective Jail Classification Workshop-Presenter | Myrtle Beach, South Carolina | American Jail Association and Horry County Sheriff's Office |
| March-12 | "Changing the Use of Force Paradigm" and Medical, Mental Health and Mail/ Publications Issues in Jails" - Jail and Prison Legal Issues Workshop - Part 2 - Faculty Presenter | Las Vegas, Nevada | Americans for Effective Law Enforcement |
| March-12 | NIC Jail Administration Seminar-Presenter | Aurora, Colorado | National Institute of Corrections |



EXHIBIT D

| | | | |
|---|---|---|---|
| May-12 | AJA Annual Training Conference Seminars-"Managing Managing Lesbian, Gay, Bi-sexual, Transgender and Intersex Persons"-Presenter; "Thinking Outside the Box"-Presenter | Reno, Nevada | American Jail Association |
| June-12 | AJA Objective Jail Classification Workshop-Presenter | Las Vegas, Nevada | American Jail Association and Las Vegas Metropolitian Police Department |
| June-12 | Jail Management Information Systems Project, Requests for Proposals, Development, Proposal Anaylsis and Implementation | Detroit, Michigan | AECom, Ghafari Associates and Wayne County Sheriff's Office |
| August-12 | NIC Jail Administration Seminar-Presenter | Little Rock, Arkansas | National Institute of Corrections and Arkansas Criminal Justice Institute |
| October-12 | Legal, Psychological and Biomechanical Aspects of Officer-Involved Lethal and Less Lethal Force, Faculty Participant, American for Effective Law Enforcement Seminar, "Paradigm Change in the Use of Force"-Presenter | Las Vegas, Nevada | Americans for Effective Law Enforcement |
| October-12 | AJA Objective Jail Classification Workshop-Presenter | Castle Rock, Colorado | American Jail Association, Douglas County Sheriff's Department and Colorado County Sheriff's Association |
| November-12 | 2012 IPICD Arrest-Related, Excited Delirium and Sudden In-Custody Death Conference | Las Vegas, Nevada | Institute for the Prevention of In-Custody Deaths |
| January-13 | "Objective Jail Classification" Seminar - Jail and Prison Legal Issues Workshop - Part 1 - Faculty Presenter | Las Vegas, Nevada | Americans for Effective Law Enforcement |
| February-13 | Drug/Alcohol Withdrawal and Detoxification System Assessment - Louisville Metro Department of Corrections | Louisville, Kentucky | Louisville Metro Department of Corrections |
| February-13 | AJA Objective Jail Classification Workshop-Presenter | Orlando, Florida | American Jail Association, Orange County Corrections |
| March-13 | "Prison Rape Elimination Act-Update" - Jail and Prison Legal Issues Workshop - Part 2 - Faculty Presenter | Las Vegas, Nevada | Americans for Effective Law Enforcement |
| May-13 | Technical Assistance Operations and Management-Converse County Jail | Douglas, Wyoming | Converse County Sheriff's Office |
| July-13 | Technical Assistance-Classification and Operational Assessment-Champaign County | Champaign, Illinois | Institute for Law and Policy Planning & Champaign County Sheriff's Office |



EXHIBIT D

| | | | |
|---|---|---|---|
| October-13 | Legal, Psychological and Biomechanical Aspects of Officer-Involved Lethal and Less Lethal Force, Faculty Participant, American for Effective Law Enforcement Seminar | Las Vegas, Nevada | Americans for Effective Law Enforcement |
| October-13 | National Conference on Correctional Health Care, "Emerging Issues in Suicide Risk Management and Prevention" - Panel Presenter; "Suicide Risk Management" - Discussion Moderator | Nashville, Tennessee | National Commission on Correctional Health Care |
| November-13 | 2013 IPICD Arrest-Related, Excited Delirium and Sudden In-Custody Death Conference, Presenter: "Impacting In-Custody Death: Helping Staff in Recognizing Symptoms of Distress" and "Emerging Trends in Correctional In-Custody Death" | Las Vegas, Nevada | Institute for the Prevention of In-Custody Deaths |
| December-13 | Technical Assistance-Classification and Operational Assessments-Blount County | Marysville, Tennessee | Institute for Law and Policy Planning & Champaign County Sheriff's Office |
| January-14 | "Objective Jail Classification Seminar - Jail and Prison Legal Issues Workshop; "Prison Rape Elimination Act Update - Jail and Prison Legal Issues Workshop - Faculty Presenter | Las Vegas, Nevada | Americans for Effective Law Enforcement |
| March-14 | Technical Assistance-Operational Assessment of Substation Lockups-Mohave County | Kingman, Arizona | Mohave County Sheriff's Office |
| April-14 | 2014 IPICD Restraint Conference, Presenter: "Impacting In-Custody Death: Helping Staff in Recognizing Symptoms of Distress" and "Emerging Trends in Correctional In-Custody Death" | Las Vegas, Nevada | Institute for the Prevention of In-Custody Deaths |
| April-14 | AJA Annual Training Conference Seminars-"Detath by Detoxification"-Presenter | Dallas, Texas | American Jail Association |
| June-14 | Direct Supervision Unit Development Consultation | Louisville, Kentucky | Louisville Metro Department of Corrections |
| October-14 | Technical Assistance-Classification and Operational Training-South Correctional Entity (SCORE) | Des Moines, Washington | South Correctional Entity |
| November-14 | 2014 IPICD Annual Conference, Presenter: "Reasonable Suicide Management in Jail" | Las Vegas, Nevada | Institute for the Prevention of In-Custody Deaths |
| November-14 | Technical Assistance/Consultation-Louisville Metro Department of Corrections-Housing Plan Development for Disciplinary Confinement | Louisville, Kentucky | Louisville Metro Department of Corrections |
| January-15 | "Objective Jail Classification"; "Prison Rape Elimination Act Update"; "Duty to Protect - from Excessive Use of Force by Us" - Jail and Prison Legal Issues Workshop - Course Director and Faculty Presenter | Las Vegas, Nevada | Americans for Effective Law Enforcement |

| | | | |
|---|---|---|---|
| February-15 | Technical Assistance Operations and Management; Policy and Procedure Review/ Development-Converse County Jail | Douglas, Wyoming | Converse County Sheriff's Office |
| June-15 | "Body Cameras in Jails" Seminar Presenter | Las Vegas, Nevada | Institute for the Prevention of In-Custody Deaths |
| November-15 | "Sex in the Jail: Managing Lesbian, Gay, Bi-sexual, Transgender and Intersex Persons" Seminar-Presenter | Bowling Green, Kentucky | Kentucky Jailer's Association |
| January-16 | "Objective Jail Classification"; "Prison Rape Elimination Act Update"; "Deaths in Custody Reporting Act Update" - Jail and Prison Legal Issues Workshop - Course Director and Faculty Presenter | Las Vegas, Nevada | Americans for Effective Law Enforcement |
| April-16 | Technical Assistance-Consent Decree Compliance-Operations and Management Review-Orleans Parish Prison | New Orleans-Louisiana | Orleans Parish Sheriff's Office |
| May-16 | Technical Assistance-Classification Assessment-Orleans Parish Prison | New Orleans-Louisiana | Orleans Parish Sheriff's Office |
| July-16 | Technical Assistance-Classification and Operational Training-South Correctional Entity (SCORE) | Des Moines, Washington | South Correctional Entity |
| January-17 | "Objective Jail Classification" Jail and Prison Legal Issues Workshop - Course Director and Faculty Presenter | Las Vegas, Nevada | Americans for Effective Law Enforcement |
| April-17 | AJA Annual Training Conference Seminars-"Death by Detoxification;" "Reasonable Suicide Management and Prevention;" and "Body Cameras in the Jail"-Presenter | Orlando, Florida | American Jail Association |
| June-17 | Montana Sheriffs and Peace Officers Association Training Conference presentations-"Sex in the Jail: Managing LGBT-I Inmates in the Jail;" "Classification and Duty to Protect;" and "Use of Force Update" | Helena, Montana | Montana Sheriffs and Peace Officers Association |
| January-18 | "Objective Jail Classification"; "Duty to Protect Inmates..from Us"- Course Director and Faculty Presenter | Las Vegas, Nevada | Americans for Effective Law Enforcement |
| April-18 | 2018 Corrections Legal Issues Update-ESLI-"Restricted Housing;" "Sex in the Jail: Managing LGBT-I Inmates in the Jail-Actions;" "Reasonable Use of Restraints in Corrections" | Hood River, Oregon | ESLI, LLC |
| April-18 | AJA Annual Training Conference Seminars-"Death by Detoxification;"-Presenter | Sacramento, California | American Jail Association |



EXHIBIT D

| | | | |
|---|---|---|---|
| July-18 | Technical Assistance-Classification and Operational Training-Campbell and Kenton County | Newport, Kentucky | Campbell County Detention Center and Kenton County Detention Center |
| August-18 | Technical Assistance-Classification and Operational Training-South Correctional Entity (SCORE) | Des Moines, Washington | South Correctional Entity |
| October-18 | Site Assessment-Sexually Violent Predators Treatment Program, Correct Care Solutions | Columbia, South Carolina | Correct Care Solutions |
| October-18 | 2018 IPICD Arrest-Related, Excited Delirium and Sudden In-Custody Death Conference, Presenter: "Death by Detoxification;" "Sex in the Jail-Part 1" | Las Vegas, Nevada | Institute for the Prevention of In-Custody Deaths |
| November-18 | 2018 Use of Force Summit Conference, Presenter: "Duty to Protect Inmates..from Us" and "Covered Windows Equals Another Wall" | Mohegan Sun, Connecticut | Daigle Law Group |
| January-19 | "Sex in the Jail-Part One"-Course Director and Faculty Presenter | Las Vegas, Nevada | Americans for Effective Law Enforcement |
| March-19 | "Objective Jail Classification Workshop"-Presenter | Cleveland, Ohio | Cuyahoga Country Corrections Center |
| March-19 | "Sex in the Jail: Managing Lesbian, Gay, Bi-sexual, Transgender and Intersex Persons" Seminar-Presenter | Los Angeles, California | Los Angeles County Sheriff's Department & Institute for the Prevention of In-Custody Deaths |
| April-19 | "Objective Jail Classification Workshop;" Death by Detoxification;" & "Reasonable Management of Suicide"Presenter | Williamstown, Kentucky | Grant County Detention Center |
| May-19 | AJA Annual Training Conference Seminars-"Death by Detoxification;" and "Restricted Housing and Our Duty to Protect"-Presenter | Louisville, Kentucky | American Jail Association |
| December-19 | 2019 Use of Force Summit Conference, Presenter: "Restrictive Housing and Duty to Protect" and "Death by Detoxification" | Mohegan Sun, Connecticut | Daigle Law Group |
| January-20 | "Sex in the Jail-Part Two"-Course Director and Faculty Presenter | Las Vegas, Nevada | Americans for Effective Law Enforcement |
| March-20 | Technical Assistance-Operational Analysis | Blountville, Tennessee | Sullivan County Sheriff's Office |



EXHIBIT D

| | | | |
|---|---|---|---|
| **May-20** | **Online Video Evidence Training Symposium** | | **Grant Fredericks-Forensic Video Solutions & Input Ace** |
| **June-20** | **Police and the Media Webinar** | | **Daigle Law Group** |
| **July-20** | **Technical Assistance Operations and Management-Review of K6G Project** | **Los Angeles County Sheriff's Office** | **Los Angeles County Sheriff's Office** |
| **January-21** | **"Sex in the Jail-Part Three"-Faculty Presenter** | **Las Vegas, Nevada** | **Americans for Effective Law Enforcement** |
| **April-21** | **"Section 1983: Jails and the Coronavirus," Commentator with presenters Jeb Brown/Kelly Moran** | **Webinar** | **International Municipal Lawyer Association** |
| **August-21** | **Technical Assistance-Classification and Operational Training-South Correctional Entity (SCORE)** | **Des Moines, Washington** | **South Correctional Entity** |
| **January-22** | **"Our "Duty to Protect"-Classification"-Faculty Presenter** | **Las Vegas, Nevada** | **Americans for Effective Law Enforcement** |
| **August-22** | **"Classification 101: An Orientation to Jail Risk Management"-Presenter** | **Seattle, Washington** | **Washington Sheriffs and Chiefs of Police Association** |
| **August-22** | **"Classification 101: An Orientation to Jail Risk Management"-Presenter** | **Spokane, Washington** | **Washington Sheriffs and Chiefs of Police Association** |
| **September-22** | **"Use of Force: An Expert's Perspective" and "Our Duty to Protect Inmates From Us"-Presenter** | **Clackamas, Oregon** | **ESLI, LLC** |
| **January-23** | **"Duty to Protect Inmates from Us"-Faculty Presenter** | **Las Vegas, Nevada** | **Americans for Effective Law Enforcement** |
| **August-23** | **"Sex in the Jail-Part One-What is Sex," and "Reasonable Suicide Management," and "Our Duty to Protect Inmates From Us"-Presenter** | **Dalles, Oregon** | **ESLI, LLC** |
| **November-23** | **"Sex in the Jail-Part One-What is Sex," "Reasonable Suicide Management," "Our Duty to Protect Inmates From Us," and "Urban Myths in the Jail"-Presenter** | **Chehalis, Washington** | **ESLI, LLC** |



EXHIBIT D

| | | | |
|---|---|---|---|
| November-23 | "Urban Myths in the Jail"-Presenter | Mohegan Sun, Connecticut | Daigle Law Group |
| January-24 | "Reasonable Use of Restraints"-Faculty Presenter | Las Vegas, Nevada | Americans for Effective Law Enforcement |



EXHIBIT D